## YELLOWSTONE SHEEP CO. v. DIAMOND DOT LIVE STOCK CO.

(No. 1661; March 31, 1931; 297 Pac. 1107)

16

For plaintiff in error there was a brief by *Brimmer & Brimmer,* of Rawlins, and *P. B. Coolidge,* of Lander, Wyoming, and oral argument by *Clarence A. Brimmer.*

For defendant in error there was a brief by *Hagens &
Murane,* of Casper, and *W. E. Hardin,* of Lander, and oral
argument by *Mr. Hagens.*

RINER, Justice.

These proceedings in error are here for the purpose of obtaining review of a judgment of the District Court of Fremont County entered in an action instituted in that court by the Diamond Dot Live Stock Company, commonly known as the Diamond Dot Sheep Company, the defendant in error, against the plaintiff in error Yellowstone Sheep Com-

pany. Hereinafter the parties will be referred to either as plaintiff and defendant or by their respective corporate names.

The litigation arose in consequence of an alleged failure on the part of the defendant to deliver to plaintiff certain sheep pursuant to the terms of a written contract executed by the parties through their respective agents on March 26, 1927. The claim of plaintiff, under its pleadings, was in substance for money asserted to have been overpaid to defendant in the course of the transaction, and also for damages inflicted by the defendant upon the plaintiff because of the former's non-delivery of a portion of the sheep specified by the contract aforesaid. The gist of the defendant's answer to this demand was, that no such overpayment had been made; that it delivered part of the sheep called for by the terms of the contract which were duly received and accepted by the plaintiff in part performance thereof, and thereafter that it tendered to plaintiff the balance of the animals in full accord with said contract, which tender was refused by plaintiff. The cause was tried by the court without a jury, with the result that the judgment complained of was given, finding generally in plaintiff's favor.

So far as necessary to due understanding of the errors alleged and urged to procure a reversal of the judgment, the evidence in the case was to the following effect: The plaintiff, acting through its vice president C. D. Zimmerman, had, prior to March 26, 1927, directed one R. B. Minty —engaged in the live stock commission business—to purchase on its account some old ewe sheep. On the date last mentioned, Minty met a Mr. John Rachou, the general manager of the defendant, in a hotel in the city of Casper, Wyoming. According to Minty's version of what then occurred, Rachou, representing the defendant, stated that he had some old ewes for sale, and during the ensuing conversation with Minty gave the latter a description of them. Minty then called up Zimmerman over the long distance phone at Douglas and told him "what these ewes were represented

20

to be by Mr. Rachou," and received instructions to purchase them for the plaintiff. Accordingly, a written contract was prepared in triplicate for the sale of the sheep, on a printed form used by Minty in his business, each party retaining a signed copy thereof.

No question is made here as to the form or execution of this agreement, which reads:

"This contract, made this 26 day of March A. D., 1927, between Yellowstone Sheep Co. of Riverton, Wyo., party of the first, and Diamond Dot Sheep Co., Douglas, Wyo., party of the second part.

"WITNESSETH: That for and in consideration of the sum of 3000.00 DOLLARS paid by said party of the second part to said party of the first part, in hand paid, said sum being a part of the purchase price, the receipt whereof is hereby acknowledged, said party of the first part hereby sells and agrees to deliver to said party of second part or their assigns, 3000 (no est.) old ewes, to be all the old ewes from entire outfit—with all sick, ruptured, crippled—sick sheep out unshorn; and against which there is no Lien or Encumbrances, title being clear; and now ranging at Fremont Co., between the 10 day of Sept. and the 20 day of Sept. A. D. 1927, at party of the second part's option, F. O. B. cars when railroad accepts shipments for final destination, weighing and inspection fees paid at Hudson, Wyo. on N. W. railroad. Party of first part to order cars for above sheep. Said sheep to be lotted in dry pens over night off feed and water, and to be weighed with dry fleeces; to be in good merchantable condition, to be free from scab and all other diseases; and to pass both State and Government inspection.

"Lambs guaranteed to average at least.................pounds at the price of.................. All lambs under.................pounds rejected. Ewes (shells thrown out) at the price of $6.50 head subject to conditions above.

"Party of the first part further agrees not to otherwise dispose of any sheep, mentioned in above sale, and said sale covers all of this particular class of sheep owned by party of the first part unless otherwise stated.

"IN WITNESS WHEREOF, said parties have hereunto set their hands in triplicate the day and date aforesaid. In the presence of

YELLOWSTONE SHEEP CO.
By John Rachou
Party of the first part.

Witness:             DIAMOND DOT SHEEP CO.
                            Party of the second part.
-----------------------------------
----------------------------------- Minty''

In the course of the trial, Minty, as a witness for the plaintiff, was asked: "What kind of sheep did Mr. Rachou say these were?" This question was objected to, as calling for "evidence that would vary the terms of a written contract;" that "the contract itself explains what kind of sheep were sold by the defendant and purchased by the plaintiff in this case, and anything said prior to that time has no bearing on the contract and cannot be introduced in evidence." Over this objection and due exception preserved, he was allowed by the court to state that: "He advised me they were all fine wool, of the Ramboullet class, white face sheep, extra good;" that "they were to be cut out in the fall of 1927;" that "he had cut out 2200 the year before and the year previous to that, 1600, so that what they had held out that year would be extra good;" that "they were held in the range herds that year and would be cut out the following fall." Rachou, as a witness for the defense, subsequently denied that any such statements were made, saying on cross-examination: "There never was a word said about first cuts, second cuts, third cuts or nothing, all that was said was old ewes." He also testified:

"Q. You just said 'I have got 3000 old ewes,' and he said 'I will snap them up at $6.50'?
"A. That is all there was to it.
"Q. And he had never seen the sheep?
"A. Never seen the sheep, I don't believe.
"Q. They were all fine wool sheep?
"A. Yes, sir.
"Q. And they were all first cut?
"A. Yes."

When the time arrived for the plaintiff to take delivery of the sheep, under the terms of the contract, its representative, W. O. Logan, came to Hudson, Wyoming, arriving there on the afternoon of September 14th, 1927, accompanied by a camp mover and herder, who were to take charge of the sheep and trail them to their destination. The next day Logan received from Rachou 1400 sheep, which—both parties agree—complied in all respects with the requirements of their contract. At the time these sheep were delivered, Logan paid to defendant $8,250, and, as the sum of $3,000 had, at the time the contract was signed, also been paid to apply on the purchase price of the animals, the defendant, at the conclusion of the transaction just related, had, accordingly, received $2150 more than was due under the contract for the sheep then delivered.

While at Hudson, Rachou advised Logan that the rest of the sheep included in the agreement, or some 1600 head, were at Moneta, Wyoming, and that as the sheep already delivered were being trailed, instead of entrained, he could pick them up on his way to Douglas, Wyoming. This arrangement was satisfactory to Logan, who returned to Douglas, saw Zimmerman on September 16th, and notified him that the balance of the animals contracted for would be delivered at Moneta on September 23rd, following. Zimmerman, accompanied by Minty and one Isaac, went to that place on the date set and there found between 1400 and 1500 old ewe sheep. They were in charge of a man by the name of John P. Cantou, who stated to Zimmerman that he (Cantou) owned the sheep; that he had a contract with the defendant relative to them, which he then read to Zimmerman. This contract, which was dated April 7, 1927, after describing Cantou as the purchaser and the defendant as the seller, recited:

"That the purchaser has this day purchased from the seller 2878 head of sheep, more particularly described as follows, upon the following terms and conditions.

1613 head of aged ewes at $11.00 per head $17,743.00''
The agreement then described the balance of the sheep sold and stated that:

"Said seller had, prior to selling the said sheep to said purchaser, contracted the ewes for Fall delivery 1927 at $6.50 per head, receiving $1.00 per head, making total $1,613, and the wool had been contracted at thirty cents per pound, receiving $1.00 per head down $2878.00, making total of $4,491.00 received by said seller, which is to be deducted from above purchase price. Tabulation as to settlement appears as follows:

After listing the items of settlement for these sheep, the final clause of the contract read:

"It is agreed by parties hereto that these sheep are sold to said purchaser subject to above mentioned sale contracts."

The instrument was signed by Cantou and the Yellowstone Sheep Company by John Rachou. It appears from the record that after purchasing the sheep and up to the time of their arrival at Moneta, Cantou had lost more than a hundred from the total number of the animals thus disposed of to him.

Cantou advised Zimmerman that he had been instructed by Rachou to turn these sheep over to the plaintiff and that he (Zimmerman) was to pay Cantou for them. Zimmerman then made an examination of the sheep, and, as he testified, found them to be coarse wool sheep and sheep that "had been cut out the year before" and were "second cuts." He then notified Cantou that he declined to take delivery of these sheep and assigned his reasons for so doing. On cross-examination he stated these reasons to be:

"I refused them for two reasons, one was that they weren't the class of sheep I bought, and I refused them because I had never bought any sheep from Mr. Cantou. Those are the two main reasons I refused them."

The testimony was sharply conflicting as to whether the sheep that Cantou tendered were coarse wool or fine wool sheep. Witnesses for the plaintiff further testified on the trial to the effect that during the latter part of September, 1927, the defendant had on its ranch some 1600 fine wool sheep, all marked with a black dot as old ewes, and all branded with the defendant's brands, as were the sheep delivered at Hudson, and that these animals were all the same grade of sheep as those received by the plaintiff at Hudson, only better. Concerning this matter also the record discloses the testimony to be in serious conflict.

As already indicated, the trial court found generally in favor of the plaintiff. Other findings were also made in substance as follows: That plaintiff and defendant entered into the written contract quoted above, and that the several sums of $3,000 and $8,250 were paid to defendant by plaintiff as heretofore stated; that on September 15, 1927, the defendant delivered to plaintiff 1400 head of the sheep required by said contract, but that defendant "wholly failed, neglected and refused to deliver to the plaintiff any more of the sheep so contracted for," although plaintiff was at all times ready and willing to receive and pay for them; that defendant "had in its possession, in September, 1927, 1600 head of old ewes of the kind so contracted for, which defendant should have delivered to the plaintiff, but which it refused to deliver," which were, at the time for delivery, "of the reasonable value of $9.50 per head;" that the plaintiff was entitled to recover from the defendant $2150—the amount paid in excess of the amount which should have been paid for the sheep delivered, together with legal interest thereon; and that plaintiff was also entitled to recover on the 1600 sheep not delivered, the difference between the contract price of $6.50 and $9.50 per head—the latter figure being found to be their value when they should have been delivered—or $4800, with interest thereon at the legal rate. Judgment was entered for plaintiff for the total amount of the recovery to which it was thus found to be entitled.

It has been strenuously argued and insisted upon as reversible error committed by the trial court in that the latter received testimony as to what was said prior to its execution by the representatives of the respective parties to the written contract aforesaid, concerning the description of the sheep agreed therein to be purchased and sold. It is said that here was a written contract, plain and unambiguous and that the admission of this oral proof tended to vary and contradict its terms, in violation of the well known parol evidence rule, whose efficacy and force both parties concede, but in whose application to the facts in this case they disagree. These contentions present the chief difficulty arising on the record.

The evidentiary rule just referred to has been stated by this court in the case of Bushnell v. Elkins, 34 Wyo. 495, 245 Pac. 304, 306, 51 A. L. R. 13, in this language:

"When parties have deliberately put their engagements in writing, and such writing is complete on its face and is certain and definite as to the objects of their engagement, it is conclusively presumed that the whole contract of the parties and the extent and manner of their undertaking was reduced to writing, and cannot be contradicted, altered, added to or varied by parol or extrinsic evidence."

For the plaintiff it is asserted, generally speaking, that the contract of the parties here is not "certain and definite as to the objects of their engagement," and hence it becomes necessary to inquire as to what is the principle which should govern if that be so, and whether the application thereof in fact conflicts with the general rule just quoted.

22 C. J. 1261, Section 1683, says, broadly:

"Parol evidence is always admissible where it is necessary in order to identify, explain, or define the subject matter of a grant, mortgage, contract, or other writing, for without such evidence it would be impossible to give effect to the intentions of the parties."

Professor Wigmore, referring to the fact that this principle has long been observed in the interpretation of descriptions in deeds, observes further (5 Wigmore on Evidence (2nd Ed.) § 2465, pages 394-5):

"But the universal application of the principle to *contracts and other documents* has also gradually been perceived. There is no transaction whatever in which, for some idea or other, the parties do not use words in a sense of their own. Having themselves locked up the idea in the words, themselves must furnish the key to unlock it. The antiquated notion (*post*, § 2470) that a document must be construed solely within its four corners, no matter how puzzling the problem, served for a time to retard the full appreciation of sound doctrine. But it was well settled by the middle of the 1800s in England; the case of Macdonald v. Longbottom, in which 'your wool' was to be interpreted, served to mark the period of full conviction. In the United States the principle has also received ample sanction and illustration."

In 4 Jones Commentaries on Evidence (2nd Ed.) § 1552, p. 2835, dealing with the question of identifying the subject matter of a written contract, it is stated that:

"Extrinsic evidence is not admissible for the direct purpose of creating ambiguity in a writing which, viewed exclusively, is plain. But extrinsic evidence is proper to apply a writing, plain in its literal sense, to the subject with which it deals, and, if the effect is to disclose ambiguity, like evidence is admissible to show the circumstances characterizing the making of the contract. Ambiguity in a written contract calling for construction may arise as well from words plain in themselves, but uncertain when applied to the subject matter, as from words which are uncertain in their literal sense; but it must relate to a subject treated of in the writing, and must arise out of words used in treating that subject."

As indicated by Mr. Wigmore in his text cited above, the English courts many years ago came to recognize and apply the rule to contracts aside from those dealing with land, and

so we find it given in the English work on Sale of Personal Property by Mr. Benjamin (6th Ed.), p. 268, in this form:

"Although parol evidence is not admissible to supply omissions or introduce terms, or to contradict, alter, or vary a written instrument, it is admissible for the purpose of explaining a latent ambiguity—for example, in order to identify the subject-matter to which the writing refers."

The learned author last mentioned then instances the case of Macdonald v. Longbottom, 1 El. & El. 977—cited also in the extract above given from the American text writer on evidence. That case was one where the plaintiff, in a conversation with defendant's agent, said that plaintiff had some wool for sale, partly his own clip, partly what he had bought from other farms, amounting altogether to a stated weight, more or less. The agent subsequently wrote to plaintiff, saying that defendant "desires me to offer you for your wool 16s. per stone, delivered at Liverpool," which offer plaintiff thereafter, by letter, accepted. In an action against the defendant for refusing the wool shipped by plaintiff to Liverpool, the trial judge ruled that evidence of the conversation had between the plaintiff and defendant's agent prior to the letters which embraced the contract between the parties, was inadmissible for the purpose of explaining what was the wool referred to in those letters. Holding that the court erred in so ruling, and that the plaintiff should prevail, Lord Campbell, C. J., remarked:

"This was an offer made to the plaintiffs, and accepted by them, of 16s. per stone for 'your wool,' to be delivered in Liverpool. The only question, therefore, is, what was the subject-matter of the contract, described as 'your wool'? I am of opinion that, when there is a contract for the sale of a specific subject-matter, oral evidence may be received, for the purpose of showing what that subject-matter was, of every fact within the knowledge of the parties before and at the time of the contract. Now Stewart, the defendant's agent, had a conversation before the contract with one of the plaintiffs, who stated what wool he had on his

own farm, and what he had bought from other farms. The two together constituted *his* wool; and, with the knowledge of these facts, the defendant contracts to buy 'your wool.' There cannot be the slightest objection to the admission of evidence of this previous conversation, which neither alters nor adds to the written contract, but merely enables us to ascertain what was the subject-matter referred to therein.''

Erle, J., concerning the same point, said:

''I am of opinion that the plaintiffs are entitled to succeed. I assume that they must prove a written contract, and that that contract must contain all the material terms. The contract here is most explicit: it is to purchase of the plaintiffs 'your wool,' at 16s. a stone, to be delivered in Liverpool. The oral evidence is, undoubtedly, admissible to identify the subject-matter of the contract, and to show what 'your wool' really was. The Judge, who has to construe the written document, cannot have judicial knowledge of the subject-matter; and evidence has been invariably allowed to identify it. The previous conversation, therefore, between one of the plaintiffs and the defendant's agent is admissible for that purpose.''

This decision was reviewed on appeal in the Exchequer Chamber, six judges sitting, (1 El. & El. 987), where Williams, J., announced that:

''We are all of opinion that the judgment of the Court below should be affirmed. As to the main ground of the argument for the respondents, none of us entertain any more doubt than the Court below; we all think that the evidence was admissible. That evidence does not vary the written contract, but only identifies the subject-matter to which it refers.''

And Byles, J., also stated:

''The ordinary rule is that a latent ambiguity, an ambiguity which is raised by extrinsic evidence, may be removed by extrinsic evidence. * * * Such evidence, to be admissible, must not vary, but apply, the contract; and that is the effect of the oral evidence in this case.''

In Shardlow v. Cottrell, 20 Ch. Div. 90, another and later case on appeal where the description of the property sold was couched in general terms, holding that parol evidence was admissible to identify the subject-matter of the contract, Lush, L. J., said:

"I have been for a long time puzzling myself to know what can be the meaning of this objection. Suppose a horse-dealer having a great number of horses offers one of them for sale; the horse is trotted out and approved of, but the parties differ about the price. Suppose the next day the seller writes and says, 'I will let you have that horse for £50,' and the buyer writes to accept the offer, would not parol evidence be admissible to shew what horse was meant?"

Still later, the case of Bank of New Zealand v. Simpson, 1900 App. Cas. 182—an appeal from the Supreme Court of New South Wales—came before the House of Lords. There a written contract provided that the respondent, an engineer engaged in railway construction, should receive extra commission on a railway construction project "on the estimate of 35,000 £, in the event of my being able to reduce the total cost of the works below 30,000 £." The engineer asserted his right to extra compensation by action brought, and the question determined on the appeal "was whether the written contract could be rightly construed with the aid of extrinsic evidence." The railway works, considering only the actual total cost thereof, were admittedly completed for a sum below 30,000 £. The defendants refused payment of the extra commission on the ground that with the addition of the price paid for the land for the purpose of the railway and the plaintiff's fees under the agreement, the total sum paid by the defendants exceeded 30,000 £. The dispute centered on the meaning of the phrase, "the total cost of the works," taken in conjunction with the words, "the estimate of 35,000 £." The trial court admitted evidence extrinsic to the written contract, showing that in arriving at the 30,000 £ as the total cost of the works, there were included

the items on account of which defendants based their refusal to pay the extra commission. The Supreme Court held this ruling to be error, but the House of Lords decided otherwise, and in affirming the trial court's decision, said:

"Extrinsic evidence is always admissible, not to contradict or vary the contract, but to apply it to the facts which the parties had in their minds and were negotiating about.

"The rule is thus stated in Taylor on Evidence, 8th ed. vol. ii. s. 1194: 'It may be laid down as a broad and distinct rule of law that *extrinsic evidence* of every *material fact* which will enable the Court to *ascertain the nature and qualities* of the subject-matter of the instrument, or in other words *to identify the persons and things* to which the instrument refers must of necessity be received.'"

Turning to cases arising in the courts of this country, we find similar conclusions reached. In Martin v. Brown, 91 Iowa 574, 60 N. W. 182, 183, the action was brought to recover damages alleged to have been caused by defendant's failure to deliver a span of horses owned by him and in a certain pasture, pursuant to his written contract. Concerning the point in which we are interested, the court said:

"The appellee contends that parol evidence to show that the two horses examined in the pasture, before the agreement in question was made, were the ones to which the agreement was to apply is inadmissible, as tending to vary the terms of a valid written contemporaneous instrument, while it is insisted by appellant that such evidence was competent to identify the horses to which the instrument referred. At the time the instrument was made, the description, 'one span of colts, one mare and gelding, I own, now in pasture east of Leeds, Iowa,' applied to either of two teams of horses, and the only words used in the agreement which tried to distinguish the one referred to from the other are, 'I own.' That these are words of description is true. They do not of themselves designate and identify the property intended to be conveyed, however, but must be aided by extrinsic evidence.''

Where the written contract of sale was for a certain number of hogs, and it appeared by the evidence in the case that the vendor had more hogs than those sold by this contract, holding that parol testimony was admissible to identify the animals disposed of, the court, in Marshall v. Gridley, 46 Ill. 247, said:

"The court below refused to give appellant's twelfth instruction. It asked the court to inform the jury that they could not take into consideration the declarations of the parties, or other evidence, to identify the hogs that were the subject of the contract. It is a rule of uniform application, that parol or other extrinsic evidence may be resorted to, for the purpose of identifying the property sold. Nor does such evidence infringe upon the other rule, that a written agreement cannot be contradicted, enlarged or varied by parol. If I sell my farm as black acre, and I have other farms, the purchaser may resort to parol evidence to prove which farm is black acre. If a man sell his saddle-horse, and give a bill of sale, the buyer may prove which is the saddle-horse. So, if he sell a horse generally, and he has divers horses, parol evidence may be resorted to for the purpose of showing which horse it was. This is a rule that has never been questioned, so far as we can learn.

"Such evidence in no wise varies the contract. It is only the means of applying the contract or agreement to the object or thing to which it relates. All such uncertainties are latent ambiguities, and the authorities all concur in holding that they may be explained by extrinsic evidence. Where a contract, on its face, seems to be explicit and certain, but is rendered uncertain by extrinsic evidence, then it may be explained by the same character of testimony by which the uncertainty was created."

In Goldberg v. Carolina Public Service Company, 110 S. Car. 290, 96 S. E. 404, it was held that a party to a written contract for the sale of certain "lots of scrap iron," was entitled to explain by oral testimony the meaning of the word "lots" and what particular scrap iron was sold, the court saying:

"The appellant had the right by parol evidence to explain the significance of this word in the contract. It was not a variation of the contract. The witness Hamphill ought to have been allowed to answer the question, and to testify as to the meaning of the contract, and as to what particular scrap iron was sold, when the same was in response to the allegations in the pleadings. The appellant should have been allowed to show what the word 'lots' meant, and to have shown that the large quantities of scrap iron claimed by the respondent were used by the appellant in rebuilding the plant at Charleston."

A written contract for the sale of personalty stated, "that it included all personal property on said ranches, 'live stock, hay, grain, and farm and dairy implements,. furniture, etc., except 14 head horses, two dozen chickens, and piano and parlor table and hall piece, one saddle and bridle.'" It was held that parol evidence was admissible to identify the property described as sold, the appellate court's view, in Mills v. Jackson, 19 Cal. App. 695, 127 Pac. 655, 656, being expressed thus:

"The court did not err in allowing parol evidence of the negotiations between the parties. The effect of this was not to vary the terms of any written contract. It is apparent that the written memorandum received in evidence is quite incomplete as to the personal property. There was no attempt therein to enumerate or specify the articles definitely,. and hence parol evidence was proper and necessary for their identification—in other words, for the purpose of showing that the personal property described in the complaint was. identical with that intended to be and actually sold."

The case of Stoops v. Smith, 100 Mass. 63, 1 Am. Rep. 85, 97 Am. Dec. 76, is quite instructive on the point under consideration. That was an action on a written agreement to pay plaintiff "fifty dollars for inserting business card on two hundred copies of his advertising chart, to be paid when the chart is published." It was decided that parol evidence was admissible for the interpretation of the contract and its application to the subject-matter that at the

time of making the agreement the plaintiff represented and promised that his advertising chart should be composed of a certain material and be published in a certain manner. Judge Wells, speaking for the court, discusses the matter in able language, which has been quoted verbatim by Mr. Wigmore in Section 2465 of the latter's treatise mentioned above, as follows:

"The purpose of all such evidence is, to ascertain in what sense the parties themselves used the ambiguous terms in the writing which sets forth their contract. If the previous negotiations make it manifest in what sense they understood and used those terms, they furnish the best definition to be applied in the interpretation of the contract itself. The effect must be limited to definition of the terms used, and identification of the subject matter. If so limited, it makes no difference that the language of the negotiations relates to the future, and consists in positive engagements on the part of the other party to the contract. Their effect depends, not upon their promissory obligation, but upon the aid they afford in the interpretation of the contract in suit. They are not the less effective for the purposes of explanation and definition because they purport to carry the force of obligation.

"The contract in suit may illustrate this principle in a point that is not in dispute. The defendant agrees to pay fifty dollars 'for inserting business card,' &c. In applying this stipulation, if the defendant had a business card distinctively known and recognized as such, there would be no difficulty in giving effect to the contract. But the identification of that card would involve the whole principle of admitting parol testimony for the interpretation and application of written contracts to the subject-matter. It could be done only by the aid of parol testimony. Suppose he had several business cards, differing in form and contents, but one was selected and agreed upon for the purpose at the time the contract was signed; or that one had been prepared specially for the purpose. Clearly parol testimony would be competent to identify the card so selected or prepared; and to prove that the parties assented to and adopted it as the card to which the contract would apply. Suppose, thirdly, that no such card had been selected or prepared, but its form, contents and style had been described verbally and

assented to, and the plaintiff had agreed to insert it as so described. Such evidence may be resorted to, not for the promise it contains, but for the aid it affords in fixing the meaning and applying the general language of the written contract.''

A comparatively recent case from the same court also affords us aid on this question. In the case of W. R. Grace & Co. v. National Wholesale Grocery Co., Inc., 251 Mass. 251, 146 N. E. 908, it appeared that the parties entered into a written contract whereby plaintiff sold defendant about 80 tons of ''Brazilian washed sugar,'' to be shipped from Brazil. The defendant refused to accept the sugar tendered by plaintiff in performance of the contract. The case was referred to an auditor to take evidence and report findings to the court. The auditor found, among other things, that the defendant was justified in rejecting the sugar, because the quality thereof offered for delivery was not in conformity with the contract. The appellate court took the view that it was necessary to consider only the questions of law touching that ground for rejection of the tendered article, and said:

''The finding of the auditor was that the testimony did not convince him that Brazilian washed sugar is a descriptive term sufficient without more to identify the article sold. The recitals of evidence in the report adequately show such diversity of testimony as to warrant that conclusion and to support the further finding that 'Brazilian washed sugar is not such an article as would be known or recognized by that description merely, so as to enable one to determine what would be a proper fulfillment of the contract without further evidence.' It thus appears that there was an ambiguity about the application of the words written in the contract to its subject matter. The governing rule of law on such facts is that, for the purpose of removing or explaining an uncertainty or ambiguity of that nature, parol testimony is admissible and has a legitimate function. If previous negotiations make manifest the sense in which the terms of the contract are used, resort may be had to such negotiations as affording the best definition of the actual intention

of the parties. The subject matter of the contract may be identified by proof of whatever was before the parties while they were bargaining. If the sale were by sample, or if a sample were shown, it or a description of it would be competent upon the issue whether the article tendered corresponded with that described in the contract. Stoops v. Smith, 100 Mass. 63, 66, 1 Am. Rep. 85, 97 Am. Dec. 76; Miller v. Stevens, 100 Mass. 518, 1 Am. Rep. 139, 97 Am. Dec. 123; Pike v. Fay, 101 Mass. 134; Keller v. Webb, 125 Mass. 88, 89, 28 Am. Rep. 209; Strong v. Carver Cotton Gin Co., 197 Mass. 53, 59, 83 N. E. 328, 14 A. L. R. (N. S.) 274, 14 Ann. Cas. 1182; West End Manuf. Co. v. P. R. Warren Co., 198 Mass. 320, 324, 84 N. E. 488; Avondale Mills v. Benchley Brothers, Inc., 244 Mass. 153, 157, 138 N. E. 586.

"The auditor appears to have followed this rule both in reaching his main conclusion and in the evidence which he received. The evidence as to a sample used by the broker of the plaintiff and as to his representations concerning it at the time of making the contract was rightly admitted and dealt with correctly."

In line with the foregoing authorities, see Buford v. Lonergan, 6 Utah 301, 22 Pac. 164; Morrell v. San Tomas Drying and Packing Co., 13 Cal. App. 305, 109 Pac. 632; Sponberg v. First National Bank, 15 Ida. 671, 99 Pac. 712; North American Transportation and Trading Company v. Samuels, (C. C. A.) 146 Fed. 48; De Pue v. McIntosh, 26 S. D. 42, 127 N. W. 532; Dorris v. King, 54 S. W. (Tenn. Ch. App.) 683; United Railways and Electric Co. v. H. Wehr & Co., 103 Md. 323, 63 Atl. 475; Buckbee v. P. Hohenadel, Jr., Co., (C. C. A.) 224 Fed. 14, L. R. A. 1916 C, 1001, Ann. Cas. 1918 B, 88; W. C. Brackett & Co. v. American Grocery Co., 127 Ga. 672, 56 S. E. 762; Miller v. Tanner's Supply Co., 150 Mich. 292, 114 N. W. 61; Watson v. Lamb, 75 Ohio St. 481, 79 N. E. 1075, 7 A. L. R. 514, Note Subdiv. IV, 65 A. L. R. 721, Note Subdiv. 5.

In the case at bar, the personal property covered by the written contract of the parties is designated as "3000 (no est.) old ewes, to be all the old ewes from entire outfit." The meaning of the words "old ewes" apparently is unambiguous, but upon the record here it is perfectly clear that

this is not so. "Old ewes" may mean either "fine wool old ewes," or "coarse wool old ewes;" the same term may mean also either "first cuts," i. e. old ewes cut out of the herd for the first time in the fall of the year and sold, or "second cuts," i. e. old ewes cut out of the herd in the fall and carried over the winter before disposition. Again, the sheep were to be "all the old ewes from entire outfit," i. e. all the old ewes owned by the defendant at the time. How is it possible to tell what old ewes the defendant had, which were the subject of the contract unless parol evidence de hors the instrument is permitted? The contract itself affords no information as to just what old ewes were in the defendant's "entire outfit." Neither the trial court nor this court could have any judicial knowledge of the subject matter of the contract. It is perfectly evident that the conversation between Minty and Rachou, prior to the execution of the written agreement before us, removes all doubt as to what the parties meant by the clause they used in the instrument for the purpose of designating the subject matter thereof. It is true, of course, that Rachou denied having any such conversation, but the conflict of testimony thus produced was for the trial court to resolve, and under familiar appellate practice law we may not interfere. As the previous negotiations of the parties made evident the sense in which the terms of the contract were employed, under the authorities above cited we must conclude that no error was committed by the District Court in allowing resort to those negotiations through the media of oral proof to furnish explanation as to what was really intended as the subject matter of their bargain. As Mr. Wigmore has well said: "Having themselves locked up the idea in the words, themselves, must furnish the key to unlock it." In short, the testimony of Minty concerning his conversation with Rachou prior to executing the agreement, did not vary the written contract, but merely identified the subject matter to which it referred.

From what has been said, it follows, also, that there was no error in the ruling declining to strike from plaintiff's pleading the averments relative to these preliminary negotiations between the parties which dealt with and clarified the subject matter of the contract.

The trial court, then, had a right to conclude that the contract called for the delivery of fine wool old ewes. Indeed, as we have seen, Mr. Rachou himself testified that the old ewes of the Yellowstone Sheep Company were "all fine wool sheep." As to the old ewes tendered plaintiff by defendant at Moneta, the testimony, as has already been said, was conflicting as to whether they were coarse wool or fine wool sheep. The District Court evidently reached the conclusion—and there is substantial evidence to support that view—that no sheep had been tendered at that place which complied with the terms of the agreement between the parties. Under such circumstances, we are not authorized to disturb this conclusion, however much we might be inclined to reach a different one were the matter originally before us as triers of the fact with the witnesses in person present.

Then, too, it is quite evident, so far as defendant's proofs are concerned, that the old ewe sheep tendered by the defendant to plaintiff at Moneta had been sold to Cantou by the defendant in violation of the terms of the contract between the parties here. Mr. Zimmerman assigned that as one of his reasons for rejecting the sheep. We are not prepared to say that the plaintiff had no right under its contract to rely and insist upon the animals it was thereafter to receive, being unsold and impliedly cared for by defendant and upon its own ranches and ranges in the interim. It is significant on the point that the record shows that after Cantou bought the sheep and received them into his care and control, from the defendant, he lost more than 100 of them.

It is urged that the District Court committed reversible error in sustaining objections to sundry questions which undertook to deal with the value of sheep in Fremont coun-

ty. We do not think so. For example, a witness was asked, on cross-examination: "Do you know what the prevailing price in the fall of 1927 in Fremont county was?" To which the answer was given: "I know what was being asked in 1927." He was then questioned: "Do you know what any sales were bringing?" Objection by the plaintiff was made that it was unnecessary "to confine it to any county." The court said: "You had better confine it to the country they were in down here at Moneta," and then the record shows the objection was sustained. Nevertheless, the witness answered: "No, I don't," and the answer was allowed to stand. Other questions claimed to be objectionable appear to have called for answers irrelevant and immaterial in the view the trial court was authorized to take of the proof submitted. Besides, both parties were allowed to go quite fully into the question of the market value of old ewes in the fall of 1927 and we do not believe that the evidence excluded so prejudicially affected the defendant's case as to require a new trial.

Neither are we able to perceive that there was error in the ruling which declined to allow a witness to answer the question: "What was the practice of the Yellowstone Sheep Company in connection with tenants and those ranges?" There was some testimony allowed in the record along this line, and the Cantou transaction was very fully described. It is true that the circumstances in which the parties to a contract are placed are generally admissible in evidence, when they will throw light upon the problems submitted to a court in litigation thereon, but to broaden the inquiry to the extent required by the question objected to, could, as we see it, serve no useful purpose.

After all the evidence in the case had been submitted, the defendant moved that it be allowed to amend its answer by pleading that 1400, instead of 1500, sheep were delivered to plaintiff at Hudson, and that defendant gave plaintiff a check for $650. This motion the court denied. All the testimony concerning this transaction had, however, previously

been allowed to come into the record. It was in some respects conflicting and undertook to establish a payment of $650, not to plaintiff but to one Logan for 100 sheep, which it was claimed, by defendants, had escaped from the herd and mingled with the Yellowstone Sheep Company's sheep after that herd had been turned over to plaintiff's agents at Hudson. Logan, it appears, was authorized only to receive the sheep for plaintiff and to deliver a check signed by Zimmerman in payment for the animals.

In the case of Demple v. Carroll, 21 Wyo. 447, 133 Pac. 137, 139, 135 Pac. 117, this court said:

"On the trial and while the defendant was introducing his evidence, he asked leave to amend his answer and be permitted to plead that defendant's signature to the agreement was procured by fraud, deceit, and false representations made by plaintiff. The court refused to permit the amendment to be made, but stated, in substance, that he would permit the defendant, subject to the objection of plaintiff, to introduce his evidence on that matter. We think there was no abuse of discretion on the part of the court in refusing leave to so amend the answer at that stage of the case. To have done so would have introduced a new and important element of defense not pleaded in the answer upon which the case went to trial, and a defense which the defendant must necessarily have known to exist, if it did exist, at the time he filed his answer; and no showing was made excusing the failure or neglect to so plead in the original answer, or that the amendatory facts were unknown to the defendant prior to the application. The statute, Sec. 4437, Comp. Stat. 1910, provides, 'The party applying to amend during the trial shall be required to show that the amendatory facts were unknown to him prior to the application, unless in its discretion the court shall relieve him from so doing.' Aside from the statute the rule is quite uniform that it is not an abuse of discretion for the court to refuse to allow an amendment on the trial which materially changes the cause of action or defense."

See also Halleck v. Bresnahen, 3 Wyo. 73, 2 Pac. 537.

No showing such as these decisions indicate as necessary is called to our attention as having been made by the defendant, in connection with its motion aforesaid. We do not think the District Court was guilty of an abuse of discretion in that it ruled as it did.

Finally, it is urged that the District Court erred in allowing interest on the sum of $4800—the amount fixed by the judgment below as the damages suffered by the plaintiff for defendant's failure to deliver the remainder of the 3000 sheep mentioned in the contract. The rule in this jurisdiction on the subject is stated and applied in City of Rawlins v. Murphy, 19 Wyo. 238, 115 Pac. 436, 438, as follows:

"There is but one other question presented, that is, the question of interest. The rule and the exception thereto are stated in Kuhn v. McKay, 7 Wyo. at p. 65, 49 Pac. 473, 51 Pac. 205. The general rule being that interest is not allowed on unliquidated damages. The exception being, 'demands based upon market values, susceptible of easy proof, though unliquidated until the particular subject of the demand has been made certain by agreement or proof, are not so uncertain that no default can be predicated of any delay in making payment. (1 Sutherland on Damages, 610.) Therefore, on such a demand interest is not denied.' In this case it is true that the amount of damages recoverable was the difference in the market value of the premises immediately before and immediately after the grading, caused by the grading for which the city was liable. But the evidence shows that such market values were not susceptible of easy proof, and for that reason the case does not come within the exception. There were a number of witnesses called on that question, and they varied in their estimates of the market value of the property immediately before the grading, such estimates ranging from $8,000 to $25,000. In addition to that fact, plaintiffs were demanding damages for an injury for which the court held the city not liable. We think the court erred in allowing interest on the amount of damages to which it found plaintiffs entitled."

See also Wyoming Central Irrigation Co. v. LaPorte, 26 Wyo. 249, 182 Pac. 485, to the same effect.

As in the case just cited, in the cause before us a number of witnesses were called who differed very much in their estimates of the market value of sheep of the description here involved. These estimates vary from $1 to $4 per head increase in value in the fall of 1927 over the value of the same sheep in the spring of that year, when the contract price was made. In our opinion, the case is clearly one within the general rule designated in the quotation last above made, and it was error to allow interest on the $4800 found as damages.

The item of $550.66 interest included in the judgment should be eliminated therefrom. The cause will be remanded to the District Court with directions to so modify its judgment, and, as thus modified, the judgment is affirmed.

The costs in this court, including cost of transcript, will be equally divided between the parties, but no costs will be taxed to or in favor of either party for briefs.

*Modified and Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.