# JOHNSON v. HANOVER FIRE INSURANCE CO.

(No. 2248; May 25, 1943; 137 Pac. (2d) 615)

For the appellant there was a brief and an oral argument by *R. R. Rose* of Casper.

124

For the respondent there was a brief and an oral argument by *M. L. Bishop, Jr.* of Casper.

RINER, Justice.

These proceedings by direct appeal were instituted to review a judgment of the District Court of Natrona County in an action based on a fire insurance policy wherein C. P. Johnson was plaintiff and the Hanover Fire Insurance Company was defendant. Subsequently, the parties hereto will be designated respectively, C. P. Johnson as the "plaintiff" or by his surname and the Hanover Fire Insurance Company as the "insurer" or the "defendant".

The facts necessary to be considered in order to dispose of this litigation are substantially these: The plaintiff is engaged in the business of producing wool and has been so engaged continuously since about the year 1909. His 1937 crop of wool was clipped late in May or early in June of that year, and seventy-seven bags containing 30,807 pounds were stored in the basement room of a storage place known as the "Hawley Warehouse" in Casper, Wyoming. This basement was about 129 feet long, some 48 feet wide, and approximately 7 or 8 feet high and was used at the time the wool was stored therein for the storage also of 12 to 14 tons of straw in bales, 10 bags of a red colored vegetable compound known as "Mineral Mix" used as feed for stock and chickens, and 10 tons of salt. These bags of "Mineral Mix" each weighed about 100 pounds and the salt aforesaid was loose "sheep salt". The baled straw mentioned above was located about 30 to 40 feet from where the wool was placed. The bags containing the wool were "stood on end", were about 6½ feet high and approximately 3 feet in diameter.

On the morning of September 24, 1937, this straw

was discovered to be on fire. The Casper Fire Department gave the matter prompt attention and two or three hose lines were used for a period of some 45 minutes intermittently throwing water on the burning straw. When the fire was finally extinguished, the water stood from 12 to 14 inches in depth on the basement floor of the warehouse, and in consequence saturated all the bags of wool to that height on each as they were standing on the floor. Some 12 or 15 bags of this wool had tumbled over and these were completely saturated with the water mixed with the salt and other material on the basement floor. This fire appears to have started in the early morning hours of the day, the alarm coming to the fire stations in Casper shortly after 6 A. M. The smoke in the basement was extremely dense for a number of hours and only the firemen with proper mask protection were able to work there.

The water was finally pumped out of the basement and the afternoon of the day of the fire a truck load of the wool had been removed to another warehouse room located across the street from the Hawley structure and known as the "Chopping Warehouse". The following day the most of the wool had been thus removed and during the third morning after the fire all of it had been transferred to the dry storage room.

After the wool had been moved over to the Chopping Warehouse, it was taken out of the wet sacks and the fleeces were spread out on the floor so they could dry. Paper twine had been used to tie up the fleeces, and in some instances this was broken in handling. Where this occurred, the men doing this work did not undertake to retie them. The bags of wool which had fallen down into the water as mentioned above were so heavily saturated with it that it took five men to handle one of them. After the wool had been dried for some time, it was put back in new dry sacks and returned to the

Hawley Warehouse which was by that time quite dry. It seems to have taken about a week to resack the wool. The wool that had been water-soaked was nevertheless resacked though it was still damp. The wool at that time still possessed a very disagreeable odor, and this unpleasant smell persisted for a considerable period of time after the wool had been brought back to its original location. This wool, when first placed in sacks before the fire, had been separated and the bags marked so that the different kinds of wool could be identified. These classes of wool were: Yearling, Buck, Ewe, and Black Wool fleeces. This separation and marking was done in order to facilitate selling the product—some buyers of wool, it seems, would want one kind and others another. When the wool was resacked in the new bags after the fire, no effort was made to keep these several kinds of wool separate or to identify them. They were all mixed together in the new sacks. It also appears from the record before us that handling wool repeatedly, as was done after the fire and as described above, impairs its value when exhibited or sampled for sale.

Mr. Barley, the agent of the defendant, who had received the insurance premium due on the insurance policy herein involved on behalf of the insurer during the morning of the fire had conferred with Mr. Hawley, the warehouse owner, and directed the latter to move the wool, as was actually done, dry it, resack it, and return it to its original location. When this process was completed, the defendant paid Johnson the entire cost thereof and he repaid the warehouseman, Hawley, the amount of such payment being $231.

The owner of the wool, the plaintiff herein, did not learn of the fire for some two or three days after it occurred, being out of the city of Casper at the time on the range looking after his sheep. The first time he saw the wool, it was scattered around on the floor of

the Chopping Warehouse and the men were engaged in drying and resacking it. He had nothing to do with the process of attempting to recondition the wool as described above.

It appears also from the record that wool raised in the vicinity of Casper, Wyoming is usually marketed in that city. After the fire and when the wool had all been returned to the Hawley Warehouse, Johnson made a number of efforts to sell his wool, but was unsuccessful although he received several offers therefor which he declined to take considering that the offers were too low. Another reason why Johnson did not accept several of these offers was because they were conditioned that he guarantee that the wool had not been damaged and, as Johnson stated on the witness stand, "I didn't know how much damage" it had suffered and did not want to take the chance of having the purchaser come back on him for a "big draw-back".

The plaintiff in his testimony stated that his action in declining to accept these offers to purchase was approved by a Mr. Hill, the Manager of the Adjustment Company, employed by the insurer to adjust the claim of loss made by Johnson. Subsequently, several efforts were made by the parties to adjust this claim of loss submitted by Johnson to the insurer but with no result, and on October 10, 1939 it appears that the defendant finally rejected plaintiff's claim and declined to pay any more than the $231 heretofore mentioned.

On the trial it was stipulated between the parties that the number of pounds of wool stored in the Hawley Warehouse was as stated above and that the "cash market value of plaintiff's 1937 wool clip at Casper, Wyoming on the 23rd day of September, 1937," the day before the fire, was "25¢ per grease pound". It was also stipulated that:

"On the 12th day of June, 1939, plaintiff sold his 1937 wool clip to A. W. Hilliard & Son, Boston, Massa-

chusetts, according to the terms of a written contract between said parties, and received the then market value of his wool, viz.: 58¢ per clean pound scoured basis landed in Boston or 18.08¢ per grease pound landed in Boston. That the freight on said wool from Casper, Wyoming, to Boston, Massachusetts, amounted to $1.85 per hundred, so that plaintiff received a net of 15.21¢ per grease pound for his said wool."

The record is further to the effect that a sale of wool on a "scouring basis" is extremely unusual. However, in this instance the larger portion of the purchase price was paid to Johnson by the buyer before the wool was shipped East.

One of the witnesses for the plaintiff, Mr. Martin Baskett, a man of extended experience in not only producing but also in buying and selling wool, testified, as an expert witness on behalf of the plaintiff and upon an hypothetical question put to him, he having not seen the wool owned by the plaintiff, that the immediate sale of the wool had been damaged 20 per cent of its value before the fire. Another witness, a Mr. Green, who had been engaged in buying wool for various eastern wool houses for some 28 years, had examined plaintiff's wool at the time it was clipped and also at the request of the owner had examined about 20 sacks of the same wool shortly after the fire. He took samples of the fleeces from the bottom and sides of the wool bags by opening them for that purpose. He described the condition of the wool to the wool house he was at the time representing, and then he made Johnson an offer on behalf of these people of 12½¢ per pound, and that at that time, as he stated, he considered 12½¢ the fair market value of the wool. In other words, these witnesses testified that the wool had been damaged by the conditions to which it had been subjected, the one witness 20 per cent and the other 50 per cent. No testimony appears to have been submitted by the defendant

with the purpose of disputing the opinions of these witnesses.

It would appear to be well established:

"As a general rule, the measure of damages for an injury to personal property which has not been entirely destroyed is the difference between its value at the place immediately before and immediately after the injury. * * *"

25 C. J. S. 597, Section 83, citing numerous cases from many jurisdictions. See also 17 C. J. 877, Section 183 and cases cited in note 8; German Insurance Company v. Everett, 10 Tex. Civ. App. 514, 46 S. W. 95; Second Society of Universalists in Town of Boston v. Royal Insurance Company, 229 Mass. 294, 118 N. E. 292; Patriotic Insurance Company of America v. Franciscus, 55 Fed. (2d) C. C. A. (8th Cir.) 845; Tinsley v. Aetna Insurance Company of Hartford, Connecticut, 199 Mo. App. 693, 205 S. W. 78; Hoffman v. The Western Marine and Fire Insurance Company, 1 La. Ann. 216; McIntyre v. Liverpool, London & Globe Insurance Company, 131 Mo. App. 88, 110 S. W. 604; Read v. State Insurance Company, 103 Iowa 307, 72 N. W. 665; Mosrie v. Automobile Insurance Company of Hartford, Connecticut, 105 W. Va. 226, 141 S. E. 871; Security Nat. Fire Insurance Company v. Kifuri, 12 S. W. (2d) (Tex. Civ. App.) 235; Parodi v. Universal Insurance Company, 128 N. J. L. 433, 26 Atl. (2d) 557.

It will be recalled that plaintiff's witness, Martin Baskett, testified as a wool expert in response to an hypothetical question that the plaintiff's wool had been damaged twenty per cent. It is objected on behalf of the insurer that Baskett was not qualified to thus testify. We are, however, unable to assent to this view. His testimony taken in its entirety shows that he had been continually engaged in wool growing and also in the selling of that product since the year 1909 in both

Natrona and Fremont Counties in this state; that he had a number of years experience as agent for the National Wool Marketing Association; and that he had sold his wool every year since the date last mentioned. He displayed, as we think, a thorough knowledge of the customary manner in which wool is prepared for marketing, how it is handled, and how it is usually bought and sold in the city of Casper, Wyoming.

It is said in 22 C. J. 526, Section 610 that:

"Whether or not the qualification of a witness with respect to knowledge or special experience is sufficiently established is a matter resting largely in the discretion of the trial court, whose determination is usually final and will not be disturbed by an appellate court except in extreme cases where it is manifest that the trial court has fallen into error or has abused its discretion, and that prejudice to the complaining party has resulted, even though the appellate court might have decided differently if the question had been presented to it in the first instance."

To the same effect supported by a very elaborate list of authorities is 20 Am. Jur. 660, Section 786, where this language is found:

"The determination of the question of the competency and qualifications of one offered as an expert witness is addressed to the judicial discretion of the trial judge before whom the testimony is offered, and his ruling in passing on the qualifications of such proposed expert witness will not be disturbed unless the error is clear and involves a misconception of the law; * * *"

We are well convinced that the trial court did not abuse the discretion vested therein and that no prejudice to defendant resulted from the fact that Mr. Baskett was permitted to testify as an expert witness.

The hypothetical question above referred to which was propounded to this witness was:

"Now Mr. Baskett, from your experience in growing

wool, displaying the same for sale, and working for the National Wool Corporation, would there be any damage to the immediate sale of wool at Casper, Wyoming, which had been shorn during the spring of 1937 near Casper, Wyoming, the fleeces tied with paper twine and sacked in wool bags according to the usual methods of tying wool and sacking it and then stored in the basement of a warehouse with a quantity of stock salt and mineral feed and about twelve or fifteen tons of baled straw, which straw caught on fire causing heavy, dense smoke, and the water used by firemen in quenching the fire, dissolved a large portion of the salt and mineral feed and the bottom portion of the wool in each bag became saturated with this mixture and about twelve of the bags fell down and the wool therein completely saturated, the amount of water in the basement being approximately fourteen to sixteen inches in depth, and all the bags of wool were taken to another warehouse, ripped open and spread out to dry, it taking about two and one-half days to get all the wool out of the water; the twine around many of the fleeces falling apart, the wool being re-sacked in new wool bags in such a manner that the wool lost its identity as to which bags contained ewe wool, buck wool and yearling wool; it taking about six days to re-sack the wool; the wool having a most obnoxious odor for a considerable length of time after the re-sacking?"

To this question an affirmative reply was given by the witness. He was then asked, "In your opinion, how much damage to the immediate sale of the wool would result from such conditions?" and to this query he responded, "I think around twenty per cent." Asked upon what he based his conclusion, he said that "It is obvious that wool having gone through such an experience would suffer some injury, the amount of which would not be readily determined. Not only would it suffer the actual damage, but the owner would suffer from the reluctance of the buyers to buy such wool."

It is claimed for the insurer that the evidence in the case does not supply a proper basis for the facts assumed by this question. But a careful examination of

the record has made it plain to us that the defendant is quite mistaken in this contention. For example, it is urged that there was no proof that the salt got into the wool owned by the plaintiff. The latter's witnesses testified that the water thrown into the basement of the warehouse by the Casper Fire Department to extinguish the fire was 12 to 14 inches deep on the basement floor and that the wool bags mostly stood on end but that some 12 to 15 of them had fallen down into the water; also that there were some ten tons of loose sheep salt not in bags in that basement. It is common knowledge, we think, that water will dissolve loose salt, and there can be little doubt that in this instance salt water saturated the wool bags, some partially and 12 or 15 of them completely. If it were thought there was the least doubt in the matter, it would seem to be removed by the testimony of one of the defendant's own witnesses, the fireman, Carter, who stated that he saw salt on the wet wool.

It is urged also that there was no evidence to support the assumption "that the fleeces were tied with paper twine and sacked in wool bags according to the usual methods of tying wool and sacking it." The testimony of the plaintiff, Mr. Baskett and the witness Link shows that this contention cannot be upheld. It is claimed also that the hypothetical question "did not fairly present the evidence in the case." This court has approved the rule announced in 18 Ann. Cas. 646, 648 where this was said:

"The rule announced in the reported case, that a hypothetical question need not include all the proven facts on the particular subject on which the expert's opinion is to be given, but that counsel may embrace in his hypothetical question such a combination of facts as he may deem established by the evidence, and take the opinion of the expert witnesses thereon, leaving to the opposing counsel, if he does not deem all the established facts to be included in the question, to include them on

cross-examination of the witness, is supported by the weight of authority. * * *"

See Branson v. Roelofsz, 52 Wyo. 101, 70 P. (2d) 589 and cases cited. It is thought not necessary to detail other objections to the question and as we view the matter, it may properly be said, as above suggested, that they are without foundation.

We are also inclined to think that the plaintiff's witness, Green, was rightly allowed to state what he considered the fair market value of the wool when he examined it after the fire.

20 Am. Jur. 748-9, Section 891 says:

"The standard of qualification of a witness by whom opinion testimony regarding property values is offered is usually not fixed very high. It is not required of the witness that he be expert or skilled in the strict sense of such terms. It is universally recognized that opinion testimony of nonexperts who have sufficient knowledge of the value of the property in question or have had ample opportunity for forming a correct opinion as to it is admissible. * * * Whether the witness is properly qualified is a question addressed primarily to the sound discretion of the trial judge, and his action will not be reviewed in the absence of a showing that he has abused that discretion. * * *"

With the testimony of these witnesses before it and the agreed written stipulation of the parties presented to the District Court to the effect that the actual cash market value of plaintiff's 1937 wool clip at Casper, Wyoming the day before the fire was 25¢ per grease pound, the District Court was in a position to determine, as it did, the amount of damage to plaintiff's wool which the defendant should pay.

The only other matter which we deem of sufficient importance to discuss at this time is the allowance of interest on the damage thus fixed by the trial court,

this interest allowance being calculated from the date of the fire.

In Kuhn v. McKay, 7 Wyo. 42, 65, 66, 46 Pac. 853, 49 Pac. 473 on petition for rehearing Mr. Chief Justice Potter pointed out that:

"It is, no doubt, the general rule that interest is not allowed on unliquidated damages. The reason for the rule is said to be that in such case the person liable does not know the amount of his indebtedness, and can therefore be in no fault for delaying payment. There is a clear recognized exception to the rule, however, well sustained by authority. Demands based upon market values, susceptible of easy proof, though unliquidated until the particular subject of the demand has been made certain by agreement or proof, are not so uncertain that no default can be predicated of any delay in making payment. (1 Sutherland on Damages, 610) Therefore on such a demand interest is not denied."

After citing authorities, this was said:

"We think this case comes clearly within the exception to the general rule. It is true that the evidence concerning the market value of the stock is meager, but so far as it goes, it stands uncontradicted. It was all to one effect. The only competent testimony, perhaps, upon the subject was that which related to a sale of some shares of the same stock by a witness to the plaintiff in error. The price paid upon that sale was the par value. No explanation or denial of the circumstance thus testified to was offered. If the jury had any evidence of value, and we have held that they had, but one valuation. was mentioned. By reference thereto the damages were susceptible of ascertainment by computation. The case is not one where contradictory testimony respecting values appears. * * *"

Since the decision last mentioned, this court has consistently followed the rules thus announced. See City of Rawlins v. Murphy, 19 Wyo. 238, 115 Pac. 436, 438; Wyoming Central Irrigation Co. v. Laporte, 26 Wyo.

249, 182 Pac. 485; Yellowstone Sheep Company v. Diamond Dot Livestock Company, 43 Wyo. 15, 40, 41, 297 Pac. 1107.

The text of 26 C. J. 575, Section 795 says that:

"But where the loss is a partial one only, and insurer is unable to estimate its amount and ascertain the sum to be paid, it has been held inequitable to charge insurer with interest. * * *"

As recognizing this rule, see Hartford Fire Insurance Company v. Bernard, 99 Okla. 44, 221 Pac. 1011.

In 7 Couch Cyc. Ins. Law, 6191, Section 1865, the text uses this language:

"And where the preliminary proofs are not such as to enable the insurer to fix the amount of a partial loss, it is held that it ought not to be charged with interest. * * *"

Additionally see National Union Fire Insurance Company of Pittsburg, Pa. v. California Cotton Credit Corp., 76 Fed. (2d) 279.

In Sutherland on Damages (4th Ed.) 1092-3, Section 347, the rationale of the rule which has received the approval of this court is set forth thus:

"Interest is denied when the demand is unliquidated for the reason that the person liable does not know what sum he owed, and therefore cannot be in default for not paying. Those damages which are wholly at large, depending on no legal standard, and which are referred to the discretion of a jury, can never be made certain except by accord or verdict. There can be no default in respect to their payment and they are never enhanced by interest. But demands based upon market values susceptible of easy proof, though unliquidated until the particular subject of the demand has been made definite and certain by agreement or proof, are not so uncertain that no default can be predicated of any delay in making payment. * * *"

So. 1 Sedgwick on Damages (9th Ed.) states:

"Generally speaking, no interest can be recovered for breach of a contract, where the damages are in their nature unliquidated, until the amount is ascertained. * * * nor can it be recovered in an action for failure to deliver goods which have no market value * * * or upon an unvalued policy of insurance, as a fire policy; or in general, for a breach of contract where by the nature of the case the damages are uncertain."

In the case at bar, the plaintiff sued for the sum of $2707.94. The District Court by its judgment allowed only $1540.35. Neither of the parties claimed to know what the damages to the wool were immediately after the fire. These damages were unliquidated and not "susceptible of easy proof." Many elements entered into the question of what was the damage to the wool so as to render it uncertain. Some of these were: The wetting of the wool, its saturation with heavy smoke from the burning straw, the enforced handling of the wool in both unsacking and resacking it, the failure to separately sack and identify the different kinds of wool, the disagreeable odor which the wool emitted after the fire and the reluctance of prospective purchasers to deal with the wool after such an experience.

Plaintiff's own witnesses, Baskett and Green, did not agree as to the amount the wool was damaged, the former fixing the amount, as we have seen, at twenty per cent and the latter at fifty per cent, a variance of thirty per cent. It was not certain what the insurer should pay until the court determined that amount by its finding and judgment. The situation thus presented called for the application of the general rule announced by the Kuhn case and not the exception mentioned therein which was in fact applied in that decision. In that case the evidence "was all to one effect," as the opinion declares. It was clearly not so here.

These considerations lead to the conclusion that the

judgment of the District Court of Natrona County should be modified by striking therefrom the allowance of interest in the sum of $453.75 and as thus modified the judgment should be affirmed. Other questions are discussed by the parties, but we are not inclined to think they affect the disposition of this case as thus indicated.

*Modified and affirmed.*

KIMBALL, Ch. J., and BLUME, J., concur.