# THE UNITED RAILWAYS & ELECTRIC COMPANY *vs.* HENRY WEHR & COMPANY.

*Contracts—Admissibility of Parol Evidence to aid in Construction— Contract Partly in Writing and Partly by Parol—Measure of Damages—Striking out Evidence.*

When a written contract provides for the sale of the scrap iron remaining in a building which had been destroyed by fire, parol evidence is admissible on the part of both seller and buyer to show what articles were pointed out in the building as being for sale prior to the execution of the contract.

When a buyer under a contract for the sale of the scrap iron in a building testified that before making the contract the seller orally agreed to tear down the building and dispose of the structural steel therein, evidence of the seller to contradict this testimony is admissible and also to show which of the contracting parties was to perform the work of demolishing the building.

A general motion to strike out certain evidence should be denied if any part of the evidence is admissible.

In the construction of a written contract parol evidence is admissible as to the subject-matter and the surrounding circumstances when necessary to place the Court in the same situation as the parties who made the contract.

Under a contract for the sale of the scrap iron in a building injured by fire, the structural steel therein is not necessarily included, and parol evidence is admissible to show whether the parties intended to include such material, and also to show whether the building was to be torn down and if so, by which party.

Whether all the terms of the contract are contained in the writing exchanged between the parties is a question for the jury, and not for the Court to rule as matter of law.

When a contract provides for the sale of old material in a structure to be taken away by the buyer and the seller afterwards refused to permit the same to be removed, the measure of damages is the difference between the contract price and the market price at the time of the refusal.

Defendant company, the owner of a power house injured by fire, asked the plaintiff by letter, dated June 7th, for a bid for the scrap iron as it lay therein, not including engines, generators, valves or piping. Plaintiff inspected the building in company with defendant's agent to see

what was to be sold and then wrote to the defendant, offering a certain sum "for all the old material which you have for sale at the power house, as per specifications mentioned" in the letter of June 7th. This offer was accepted. In an action to recover damages for defendant's refusal to allow plaintiff to remove certain material, plaintiff testified that at the time of said inspection defendant's agent agreed to tear the building down and sell him the structural steel, and also that the boilers were included in the contract. *Held*, that evidence of the defendant's agent to contradict that of the plaintiff is admissible to show that neither the structural material nor the boilers were pointed out to plaintiff as part of the material to be sold.

*Held*, further, that it was error to rule that by the true construction of the contract the plaintiff bought and the defendant sold all the scrap iron in the power house not excepting the boiler room, save the material excepted in the letter of June 7th.

Appeal from the Baltimore City Court (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, SCHMUCKER, JONES and BURKE, JJ.

*Fielder C. Slingluff* (with whom was *T. Rowland Slingluff* on the brief), for the appellant.

The contract was made in the following manner: A request from Staub for a bid; an examination of the premises to see what was to be bid upon, and a verbal understanding between the contracting parties upon this point; a bid by the appellees based upon this verbal understanding, and an acceptance by Staub of the bid, verbally, having in mind that the bid had reference only to the material he had pointed out as for sale. When H. Wehr denied this conversation and understanding, the question resolved itself into one of veracity between Staub and Wehr, and the great majority of the remaining testimony in the case, produced on behalf of the defendant, was for the purpose of showing circumstances corroborative of Staub's version of the parol portion of the contract, as for instance—

H. Wehr was president and a majority stockholder of the Canton Rolling Mill Co. at the time this contract was made. The Potomac Engineering and Construction Co., under contract, had been employed by the appellant to dismantle and remove the boiler room portion of the power house. It was

to be paid $2,450 for its work, and in addition acquired all of the material in the portion to be wrecked. It was engaged upon its work at the same time the appellees were upon theirs. Messrs. Singer and Brady, both connected with the Potomac Co., testified that a Mr. Brown, of the Canton Rolling Mill Co., came to the power house in company with Mr. H. Wehr and made Mr. Singer an offer of $13 per ton for the very material in the boiler room that Mr. Wehr in this suit is contending was purchased by him under his contract with Staub.

An attempt upon Wehr's part to purchase through one of his companies, the Canton Rolling Mill Co., what he claims his other company, H. Wehr & Co., had already purchased.

If the appellant had sold this 535 tons as it afterwards was shown to amount to, of material to the appellees, at $9.00 per ton, what possible benefit could it derive from a contract entered into shortly thereafter, under the terms of which they not only gave the material to the Potomac Engineering and Construction Company, but paid it $2,450 to take the stuff away.

The Court first granted the motion by which it struck out *all* testimony of the witness Staub so far as said testimony was offered for the purpose of establishing terms of the contract by means of conversations had prior to the letter of June 14th.

The question involved in *Machen* v. *Hooper*, 73 Md. 374, was, the correct meaning of a phrase used in a lease, and, instead of allowing itself to be bound by the "artificial and mechanical rules of construction," which formerly prevailed, this Court adopted the broader and more modern view of LORD MANSFIELD, in *Kinston* v. *Preston*, 2 Doug. 689, that, "the evident sense and meaning of the parties was the true object of inquiry by the Court," and they looked for the real meaning of the phrase in the contract from the standpoint of the parties at the time of execution. See also *Bollman* v. *Burt*, 61 Md. 420; *Roberts* v. *Bonaparte*, 73 Md. 204; *Goddard* v. *Foster*, 17 Wall. 142.

In the case at bar the situation requires a similar rule of construction. There was the request for a bid for the scrap iron in the damaged power house, which standing alone,

would evidently mean *all* the scrap. But the bid, in response thereto, is for all the old material *which you have for sale* at the power house. These words have some meaning. They were not called for by the request for a bid, which was an invitation to bid for the scrap and would have been most simply answered by a bid of $9 per ton for the scrap in the power house.

The Court has before it no written acceptance of the offer, thus completing a written contract, and which might assist it in arriving at the true meaning of the bid. So it must go out side of the written instrument. The meaning of the phrase becomes very clear when there is taken into consideration the circumstance that Staub told Wehr that only a portion of the material at the power house was for sale. Wehr then would naturally make his bid for all the material *"which you have for sale."* Evidence of this understanding is undoubtedly admissible under the principle of law set out in *Roberts* v. *Bonaparte, supra,* at 197, and what was the real contract in the case at bar, should have been left to the Court, as a jury, because this contract, if there be one at all, was partly written and partly parol.

It is submitted that, for two very evident reasons, then, the testimony of the witness Staub, stricken out by the granting of the plaintiff's motion, should have been admitted:

1. Under the principles of law laid down in the Machen case, *supra,* to assist the Court in properly arriving at the purpose of the appellees in the use of the words "which you have for sale" in their written bid or offer; and,

2. Because, just as was the contract in *Roberts* v. *Bonaparte case, supra,* so was the contract here, partly written and partly parol, and this being so, parol evidence was admissible to show the real contract between the parties, and "the whole must necessarily be a question for the jury." *Roberts* v. *Bonaparte,* at 200.

That the bid was accepted and a contract formed is not denied by the appellant. This is shown by some of the later correspondence between the parties, but whether or not the

acceptance was of the offer to buy all of the material at the power house or all of the material *for sale* at the power house cannot be gathered from any of the correspondence.

Acceptance is shown also by the fact that payments on account were made to the appellant, and that the appellees entered upon the premises and proceeded to remove the scrap. That they were stopped by the agents of the appellant after certain material had been removed evidences the appellant's understanding of the offer and acceptance.

So it will be seen that the all important evidence for the Court and jury to have before them is the understanding between Staub and Wehr, had between the time of the request for an offer and the offer, or pending the making of the contract.

*W. Calvin Chesnut* and *Chas. Markell, Jr.* (with whom were *Gans & Haman* on the brief), for the appellees.

The contract in this case was established by the offer made in the letter of June 14th and the acceptance of this offer. The letter of June 7th was in effect incorporated by reference into the letter of June 14th, so that the terms of the offer are to be found in the letters of June 7th and 14th. By the acceptance of this offer, the offer became a contract. *Courtney* v. *Knabe*, 97 Md. 499, 525. The terms of the contract are, therefore, to be found in the letters of June 7th and 14th.

The acceptance of the offer is established both by the plaintiffs and by the defendant's witness Staub, and the existence of the contract in this case is, therefore, conceded. The only question made is as to the terms and construction of the contract. The defendant maintained that because the acceptance of the contract was not effected by a writing, the contract was not a written contract, but was partly written and partly oral, and that, therefore, the terms of the contract could be established by parol evidence of negotiations previous to the letter of June 14th. Such a contention is, however, in the case at bar, at variance with the parol evidence rule. As stated by *Greenleaf*, sec. 275: "Parol contemporaneous evidence is in-

admissible to contradict or vary the terms of a valid written instrument." This rule (which is really a rule of substantive law, and not a rule of evidence), as applied to contracts, has reference only to the terms of the contract and not to the existence of the contract.

The rule has no reference to the *existence* of a contract which can always be proved or disproved by parol evidence, even though parol evidence be inadmissible to alter the *terms* of the contract after its existence is established.

· Thus, even though a written contract be signed by both parties, it may be shown by parol that such a paper was only to become effective on the happening of a condition and that, therefore, the paper had not yet come into existence as a binding contract. *Gorsuch* v. *Rutledge*, 70 Md. 277. The same case, however, held that parol evidence was inadmissible to establish the terms of the contract. It is always permissible · to show that for want of delivery, acceptance or for any other reason, a paperwriting executed by the parties has yet no existence as a contract. *Southern Adv. Co.* v. *Metropole Co.*, 91 Md. 61; *Burke* v. *Dulany*, 153 U. S. 228, 234; *Wehr* v. *Allen*, 128 U. S. 590, 595.

Where the terms of a contract are in writing, even though the acceptance of one of the parties be affected by parol or by acts, the written contract is effective and the terms of the written contract cannot be varied or contradicted by parol.

The acceptance of a contract by assenting to its terms, holding it and acting upon it may be equivalent to a formal execution by one who did not sign it. *Sellers* v. *Greer*, 172 Ill. 549; 40 L. R. A. 589. This rule was applied in a case where the contract was formally prepared and intended to be signed by both parties, though, in fact, it was only signed by one. *Vogel* v. *Pekoc*, 157 Ill. 339; 30 L. R. A. 495.

Whether such a contract be called a "written contract" or an "oral contract," is a mere question of words. With reference to the Statute of Frauds it might, perhaps, be called an "oral contract." It is sufficient for the present purpose that the *terms* of the contract are in writing, and, therefore, cannot

be contradicted or varied by parol evidence. In the case of *Van Winkle* v. *Crowell*, 146 U. S. 42, parol evidence was held inadmissible to vary the terms of a written contract. In that case the only writing was an order for the purchase of goods signed by one of the parties. This order was accepted by the other party, but not signed by him.

It is unnecessary in this case to go into the question, which is often a difficult one, whether all the terms of the contract are contained in a writing or whether there were other terms of the contract entered into by parol, relating to matters upon which the writing is silent, or upon which the writing is incomplete and requires the aid of extrinsic evidence.

A long line of cases in Maryland, of which the case of *Roberts* v. *Bonaparte*, 73 Md. 191, is possibly the most often quoted, apply the well-known rule that parol evidence may be admitted to prove such collateral agreement upon which the writing is silent, or to fill out the terms of an obviously incomplete writing. None of these cases, however, permit parol evidence to be introduced to contradict any of the written terms of the contract. The part to be proved by parol must not contradict the part which is in writing. 21 *Am. and Eng. Encyl. of Law*, 2 ed., p. 1093; *Merritt* v. *Peninsula Cons. Co.*, 91 Md. 453, 464.

The only terms of the contract which the defendant sought to establish by the testimony referred to in the plaintiff's motion related to a subject which was expressly covered by the letters of June 7th and 14th, and sought not to add to but directly to contradict the terms of the contract contained in these letters. The only purpose for which the defendant relied upon the conversations between Staub and Wehr to prove the terms of the contract was to show how much scrap iron was intended to be sold. By means of this conversation the defendant sought to show that only the scrap iron contained in a part of the power house called by them the "engine room," and a small portion of the scrap iron in another part of the power house called the "boiler room," was covered by the contract. Such proof, if established by the testimony, would directly contra-

dict the letters of June 7th and 14th.   The letter of June 14th,
"replying to yours on June 7th," makes a bid of $9 per ton
"for all the old material which you have for sale at the Pratt
street power house as per specifications mentioned therein."
The letter of June 7th thus referred to not only invites bids
for the scrap iron "in our damaged Pratt street power house,"
but also carefully excepts all scrap iron not intended to be sold
by the company.   This is done not only once, by the words
"not including engines, generators, valves or piping," but a
general reservation is made of any part of the material which
the company may consider can be used by it.   The letter of
June 7th was drawn with evident care and precision.   The
letter of June 14th expressly incorporated the letter of June
7th in the offer, and adds only one term, namely, the price.
In spite of this clear and unambiguous language, the defendant
seeks to prove by conversation had before the offer was ac-
tually made that the parties contracted not for the scrap iron
in the power house with the two designated exceptions, but
for all of the scrap iron in part of the power house and part of
the scrap iron in another part of the power house.   If such
proof is admitted it must be not in addition to, but in contra-
diction of, the written terms of the contract.

Even if admitted for such purpose Staub's testimony con-
cerning conversation with Wehr is legally insufficient to prove
*any term of a contract between the plaintiffs and the defend-
ant.*   Wehr & Co., as would seem to be prudent before pur-
chasing such an article as scrap iron, asked to see the stuff so
to be sold.   Staub and Wehr visited the power house, and as
Staub testified, when asked to tell exactly the conversation: "I
met Mr. Wehr there, and, of course, he asked me what was to
be included in the sale, and we walked over the ground and
I pointed out to him exactly what was included."

Staub now maintains that this request of Wehr's and Staub's
act of "pointing out exactly what was included" constituted a
term of the subsequent contract.   In spite of the fact that
Staub admits that he pointed out some girders in the boiler
room, which hung over into the engine room, it is now

claimed that because Staub did not take Wehr into the boiler room (which Wehr denies), it became a term of the contract that the scrap iron in boiler room was not to be included. On this theory, how much scrap iron was included in the contract has never been stated in language spoken or written. This was determined only by Staub's speechless "pointing" at each fragment of ruins to be included.

Even if there were no subsequent writing, "a Court should not allow loose expressions, such as this, to go to the jury for the purpose of raising obligations and rights between parties." *Blackiston* v. *German Bank*, 87 Md. 302-19·

*A fortiori* such testimony · should be excluded when it is offered to vary or contradict subsequent writings which are definite in their terms. The whole conversation between Wehr and Staub essentially amounted to such preliminary negotiations as are not intended by either party to constitute terms of the contract subsequently entered into. They are pre-eminently the kind of negotiations which are presumed· to be merged in the subsequent written contract. Even if such loose and vague expressions could be said to evidence any agreement between the parties, this agreement would be superseded by the subsequent inconsistent agreement effected through the offer in the letter of June 14th, and the acceptance of this offer. Even a subsequent inconsistent parol agreement, if proved, will supplant the original agreement and work a novation. The acceptance of the offer in the letter of June 14th, which is conceded, would have put an end to any prior inconsistent agreement.

The plaintiffs' fourth prayer construes the contract between the parties according to the terms of the letter of June 14th, including by reference, the letter of June 7th. ·The reasons already urged in support of the plaintiffs' motion apply to this prayer. The construction of all written instruments is a question for the Court and not for the jury. *Roberts* v. *Bonaparte*, 73 Md. 191; *Cheney* v. *E. Trans. Line*, 59 Md. 557, 565; 23 *A. & E. L.* (2 ed.) 553· This rule is not confined to contracts. *Clark Dist. Co.* v. *Cumberland*, 95 Md. 468, 476.

BOYD, J., delivered the opinion of the Court.

This is a suit by the appellees against the appellant for an alleged breach of contract by the latter, in refusing to deliver certain scrap iron to the former, or to permit them to remove it from the power house of the appellant. The power house was destroyed, or at least very seriously damaged, by the great fire in Baltimore in February, 1904. The appellant, through a letter of its purchasing agent, dated June 7th, 1904, invited a bid from the appellees for the scrap iron, and they made an offer by letter dated June 14th, which was accepted by telephone. The Court granted three prayers and a motion to strike out certain testimony offered by the plaintiffs and rejected four prayers offered by the defendant. The only bill of exceptions in the record presents the rulings of the Court on the prayers and that motion. The case was tried before the Court, sitting as a jury, and resulted in a verdict in favor of the plaintiffs. This appeal was taken from the judgment rendered on that verdict.

Other questions presented by the record being of minor importance, we will first consider the plaintiff's motion to strike out the testimony, in connection with their *fourth* and the defendant's *second* prayer. The motion granted was "to strike out all testimony of the witness Staub so far as said testimony is offered for the purpose of establishing terms of the contract between the plaintiffs and defendant by means of conversations had prior to the writing of the letter of June 14th." The plaintiff's *fourth* prayer prayed the Court to rule "that by the true construction of the contract between the parties, the plaintiffs bought and the defendant sold all the scrap iron in the Pratt street power house of the defendant (not excepting the boiler room) save the material excepted in the letter of June 7th, 1904, from Staub to the plaintiffs;" and the defendant's *second* prayer asked the Court to rule as a matter of law that all of the terms of the contract "are not contained in the letters of June 7th and 14th" (and that) "it is the duty of the Court, sitting as a jury, to find from all the evidence in the case what the contract was, and in so doing it can consider

all the evidence in the case, written as well as oral." The quotations from those prayers and the motion suggest the theories of the respective parties, and it is only necessary to add that the principal question is whether oral testimony was admissible to show that the appellant did not sell to the appellees the structural iron in the part of the power house known as the boiler house. As the motion to strike out the testimony goes to the root of the controversy, we will first consider that.

Mr. Staub was the purchasing agent of the defendant, and as such wrote the following letter dated June 7th, 1904, to the appellees:

"Gentlemen: I would be pleased to receive from you bid for the scrap iron, not including engines, generators, valves or piping, in our damaged Pratt street power house, same to be made at a price per ton as the scrap lies. The weights on our scales at the power station to govern. The successful bidder must be prepared to make a payment, satisfactory to us, in advance, and when material to this amount has been received, make another payment in like manner, and so on, until the entire lot has been received and paid for. The company reserves the right to reject any and all bids, also to retain any part of this material, as it is turned over, that it may consider what can be used by it. Your proposition must be in my hands not later than twelve o'clock noon, Tuesday, the 14th instant. I will gladly furnish any further information you may desire in connection with this matter."

Henry Wehr, one of the appellees, by appointment met Mr. Staub at the power house for the purpose of seeing the scrap, with a view to making a bid, and on June 14th wrote the following letter to him:

"Dear Sir: Replying to yours of June 7th we are pleased to offer you $9.00 per gross ton for all the old material which you have for sale at the Pratt street power house, as per specifications mentioned therein. Advise us promptly by return mail whether this offer is accepted or not, and oblige."

That bid was accepted about June 17th over the telephone.

If the letter of June 14th had omitted the words *"which you have for sale"* and nothing had occurred but the writing of the two letters and the acceptance by telephone, a very different question from what the record presents might arise. But Mr. Wehr testified that he went to the power house to make an examination—that "his purpose in making this examination was to see *what had to be sold*, because you cannot buy things in scrap iron unless you look at them;" that "Mr. Staub pointed out what was for sale and what was not for sale; he bought everything that was left in the iron line, with the exceptions he made." Again he said "that his offer of June 14th of $9 a ton was the resulting bid from his examination of the premises * * * in making his bid of $9 per ton he considered that he would not have to wreck the power house; that the railway company would have to take the power house down; he explained this fully to Mr. Staub, saying, when you get to work to take the power house down, leave that work there, and we will work with you." His cross-examination as stated in the record concludes thus: "When asked how much it would have cost to have wrecked the building and get out the structural steel, he replied he did not have to wreck the building under his contract, they were to take the building down, and he was to work at that time and cut out the structural material as they went along; that this understanding was had with Mr. Staub, the only person he dealt with; this understanding was had when he first went through the building with Staub and not at the time of the acceptance of his offer; that Staub agreed on behalf of the railway company to tear down the building and give him the structural steel, as it was taken down."

Mr. Staub testified amongst other things that "the first response received from H. Wehr & Co. was the request by Mr. Harry Wehr to meet him at the power house and designate exactly what was covered by the letter; that he met Mr. Wehr and took him over and showed him exactly what was to go; that the meeting with Mr. Wehr was in the interval between the time the request for the bid was sent and the receipt of

the bid on June 14th." Again he said, "But in no case was he taken into the boiler room, because that was not included; that the engine room is separated from the boiler room by a brick wall running north and south, which was standing at the time of the visit, and.apparently had not been injured; that he did not take Mr. Wehr into the boiler house at all; that the purpose of the visit was to point out to Mr. Wehr exactly what he was to bid on." On cross-examination he said the boiler room was not mentioned in the conversation with Mr. Wehr, and in answer to a question, "Why was the boiler room not included, what reason have you for seeking to give us the impression that the boiler room was not included in the sale of scrap iron at the power house?" he replied, "Because the boiler room was considered by our people intact, not damaged." He was corroborated by other witnesses as to the condition of the boiler house.

Mr. Wehr and Mr. Staub contradicted each other flatly as to the boiler room and some other matters, but we see from Mr. Wehr's own testimony that he went to the power house for the purpose of ascertaining what was to be sold, and its condition, and that Mr. Staub pointed out *"what was for sale and what was not for sale."* That being proven by one of the plaintiffs, and especially as his testimony was permitted to remain in why should that of Staub have been stricken out? The letter of June 7th concluded by saying "I will gladly furnish any further information you may desire in connection with this matter." Wehr did call upon him for further information, and Staub pointed out what was for sale and what was not, and then the appellees wrote the letter of June 14th, in which they bid "for all the old material *which you have for sale* at the Pratt street power house, as per specifications mentioned therein." The words *"which you have for sale"* meant something, and when taken in connection with the testimony of both Mr: Wehr and Mr. Staub were of the utmost importance in determining the controversy between these parties. The letter concluded by saying "as per specifications mentioned therein," referring to the letter of June 7th, but it cannot be and is not

pretended that there were such specifications in that letter as were necessary to inform the appellees *what was for sale.* Mr. Wehr's evidence is to the contrary, and he went to the power house for the very purpose of finding out and to enable him to bid intelligently, if at all. The "old material which *you have* for sale," certainly did not mean something which the company *did not have* for sale, and inasmuch as it is conceded that what was for sale was pointed out, but the two contracting parties differ as to what that was, it is difficult to understand how that could be determined without oral testimony. It was necessary to show what was for sale—what was pointed out—in short what the appellees were offering to buy in the letter of June 14th, and what the appellant's agent agreed to sell when he accepted the offer by telephone.

But apart from what we have said, how could the plaintiffs recover for the structural material still attached to the building on June 14th without oral testimony? Mr. Wehr testified that Mr. Staub agreed that the company would tear down the building and give them the material, as it was taken down. There is nothing whatever in the letter of June 14th on that subject, and Mr. Staub swore that "no such arrangement was made." Yet the motion granted by the Court was comprehensive enough to exclude his evidence on that subject, while that of Mr. Wehr still remained in. It may be said that the defendant did not ask to exclude the evidence of Mr. Wehr, but we do not find in the record that any of this evidence was admitted subject to exception, or that it was admitted upon the assurance of counsel that it would be followed up by other testimony which would show it to be proper, or that the right to move for its exclusion had been reserved. The general principle is well settled that unless evidence is objected to when offered, it cannot be afterwards excluded, unless its inadmissibility is not apparent at the time it was offered and when that appears it is objected to within a reasonable time. Without deeming it necessary to depart from the main question and determine whether it was too late to entertain this motion, if objection was not made to the testimony until the prayers

were offered (and the record does not show it was made before), surely it was not right to then exclude the evidence of Staub and permit that of Wehr to remain in. If the contention of the plaintiffs is correct, that they bought all the material including the structural iron still in the walls of the boiler house, it was not only relevant but necessary to prove which of the contracting parties was to tear down the building, as the cost would necessarily affect the damages to be recovered and the defendant would not be in default for material still attached to the house, unless it had agreed to tear the building down or refused to permit the plaintiffs to do so. The letters of June 7th and 14th are entirely silent on this subject, unless the expression in that of June 7th—"same to be made at a price per ton as the scrap lies"—be held to control the question, and, if that be conceded, the defendant was under no obligation to demolish the building at its own cost. Although the motion was not very definite, it was broad enough, as we have said, to exclude the testimony of Staub on this subject, as it certainly tended to establish the terms of the contract on this important question, and was an absolute denial that he had agreed, in the conversations prior to the writing of the letter of June 14th, that the company would tear down the building. It cannot be denied that if a part of the evidence excluded by the motion was admissible, it was error to strike all of it out. 2 *Poe*, 296 A, and cases cited.

The letter of June 7th asked for a bid for "the scrap iron, not including the engines, generators, valves or piping in our damaged Pratt street power house." It is, to say the least, peculiar that there was no exception of the boilers, if the boiler house was to be included. It is true that the company reserved the right "to retain any part of this material, as it is turned over, that it may consider can be used by it," but the engines, etc., were expressly excepted and Mr. Wehr testified he understood they were to be repaired. There is other evidence tending to show that it was not the intention to sell the structural material in the boiler house; and it seems to us to be clear that a jury, or a Court sitting as a jury, could not

accurately, if at all, determine what was intended to be sold and purchased without the aid of oral testimony. If it be true that the boiler house was not damaged more than the evidence offered by the defendant tended to show, it would be an unreasonable construction of the language used to say that the letters of June 7th and June 14th necessarily included the structural material in the boiler house, which could only be obtained by demolishing the building. The fact that it was subsequently demolished by the Potomac Engineering and Contracting Company, under its agreement of March 7th, 1905, does not necessarily throw any light on it. That might be explained in various ways—the railway company may have *subsequently* concluded it was best to build a new plant, possibly the city might have needed part of it in the improvements made in the burnt district, or there might be other reasons. When we look at that agreement and the one made by the Contracting Company with Henry A. Hitner's Sons, both of which were offered in evidence by the appellees, we can form some idea of the cost of demolishing the building. The Railway Company paid the Contracting Company $2,450, and gave it the building and structural materials remaining in the building and Henry A. Hitner's Sons paid the Contracting Company $7,000 for "the metal contained in and forming a part of the frame work and structure of" the part of the power house that the Contracting Company was to remove. We see therefore how important it would have been to provide in the contract who was to tear down the building, if the appellee's theory be correct as to what they purchased, yet it is not mentioned in either of the letters.

Under such circumstances as we have stated, we are aware of no principle of law that would make oral evidence inadmissible. The offer to buy "all the old material which *you have for sale*," etc., after the two representatives of the contracting parties had gone over the premises, and had seen what was for sale, necessarily required the parties to go outside of the letters to show what that was, and the law, as announced by this Court, permits proof of extraneous facts to explain the

real situation, in order to enable the tribunal which is to determine the question to ascertain the intention and meaning of the parties in the use of the language found in the writings. Of course parol evidence cannot be offered to *contradict* or *vary* the terms of a written contract, whether it be embodied in one writing or a number of them, but it is equally well settled that it is admissible to prove anything pertaining to the contract that is not included in or covered by the writings, or to explain any elements of the contract that are left ambiguous and uncertain. In *Roberts* v. *Bonaparte*, 73 Md. 191, this Court said in speaking of the two papers then before it, "It is manifest that these papers are ambiguous and uncertain in many important particulars, and need the aid of extrinsic evidence to render them intelligible. It is, moreover, a familiar principle that Courts, in the construction of contracts, look to *the language employed, the subject-matter and the surrounding circumstances.* They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." The latter part of that quotation is taken from *Nash* v. *Towne*, 5 Wall. 699. See also *Machen* v. *Hooper*, 73 Md. 342; *Scott* v. *B. & O. R. R. Co.*, 93 Md. 498. In the Bonaparte case the appellants contended that the entire contract was embodied in two written papers, while the appellee contended that they did not contain the entire contract, that there was a verbal agreement between them, made at or before the date of the papers, to the effect that his liability was to be limited to seeing that the money advanced to him by the appellants should be applied by Claggett, a packer of corn and tomatoes, to canning and not to any other purpose. The appellant had agreed in one of the writings to furnish the appellee certain amounts of money, for the purpose of enabling Claggett to pack the corn and tomatoes, "at six per cent per annum during the season

of 1888." This Court held that parol evidence was admissible under the principles above stated, and many other authorties might be cited for similar conclusions.

When we consider "the language employed, the subject-matter and the surrounding circumstances," and place ourselves "in the same situation as the parties who made the contract," as we are authorized to do, we can have no doubt of the admissibility of this evidence. The circumstances disclosed by this record present an unusually strong case to justify the introduction of parol evidence, for, in addition to what we have said, it is by no means certain that the term "scrap iron" necessarily includes structural material in a standing building. It certainly would not inclnde it in a building in good condition which was not to be torn down. If the boiler house was in the condition that Staub and other witnesses of the defendant said it was, it would be giving the term "scrap iron" a very broad meaning to apply it to girders and other such material used in the construction of that part of the building. We are then of the opinion that there was error in striking out the testimony of Staub referred to in the motion; and it follows that the plaintiff's *fourth* prayer should not have been granted. The defendant's *second* prayer was properly refused. It was for the Court sitting as a jury to determine whether all the terms of the contract between the parties were contained in the two letters, and not for the Court to rule as a matter of law. *Bonaparte's case, supra.*

It will not be necessary to discuss in detail the other prayers. The plaintiff's *first* should be modified in some respects. In view of the contradiction between the witnesses Wehr and Staub as to whether the defendant had agreed to tear down the house, that should be considered in connection with the demand of the plaintiffs for the delivery of the scrap iron. Then it does not except such scrap as the defendant may have reserved, although Mr. Frederick Wehr's testimony indicated that some had been reserved, and some verbal changes would make the prayer clearer, in view of what we have decided about the admissibility of the oral testimony. Their *second* prayer

also ignores the contradiction of the witnesses spoken of, but if it intended the market price of the iron "as it lay in said power house" to refer to the market price while it is in the walls, or connected with them, the defendant could not well be injured by that. The expression "which the defendant failed and refused to sell to the plaintiffs" was intended, we suppose, to mean to *deliver*, for the plaintiffs' case was based on the theory that the defendant did sell all of the scrap iron.

The defendant's *first* and *first A* and *fourth* prayers were properly rejected, because there was sufficient evidence of the several matters referred to in them. Its *third* assumes that all the cost of preparation for delivery was to be paid by the plaintiffs, and was properly rejected. The *second* of the plaintiffs' proceeded on the theory that the measure of damages was the difference between the market price *at the time of the refusal* and the contract price, while in the defendant's *third* it asked the Court to say it was the difference between the contract price and the market price of the scrap iron "where it was to be delivered *at the time of the delivery.*" That is the general rule when the place where and the time when are fixed, by the contract, for delivery, but no time was fixed for the completion of this contract or for the delivery of the iron. It was therefore to be taken or delivered within a reasonable time, and as there is nothing to show there was any unreasonable delay, the theory of the plaintiffs' prayer that it was the time of *refusal* would seem to be the correct one, under the peculiar circumstances of this case, as that was the time of the alleged breach. *Williams* v. *Woods*, 16 Md. 259. It follows from what we have said that the judgment must be reversed.

> *Judgment reversed and new trial awarded, the appellees to pay the costs.*