ANNIE E. GROSS *v.* JOHN T. STONE
[No. 5, January Term, 1938.]

*Decided February 4th, 1938.*

*Abram C. Joseph,* with whom was *Daniel C. Joseph* on the brief, for the appellant.

*Jacob E. Cohen,* for the appellee.

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

OFFUTT, J., delivered the opinion of the Court.

In October, 1925, Annie E. Gross bought a house and lot known as 609 Newkirk Street in Baltimore City for $4,300. She paid $1,000 in cash and eventually paid the balance. She used the property as a boarding house, and among the persons who boarded there was John T. Stone,

the appellee. Mrs. Gross is a widow, somewhat advanced in years, and in straitened circumstances. Prior to 1935 the boarding house business had gone through a lean period, her taxes were back, there were no boarders other than Stone, and she needed money. She discussed her situation with Stone, and after that she borrowed on mortgage from the Arrow Permanent Building Association $520, apparently to retire a prior loan and to pay the overdue taxes. Following that, Stone asked her what she wanted for the house, and she said $1,500. He asked whether that included the ground, and she said that it did not. After some further negotiations she agreed to take $1,000 for the house, and to create a $45 ground rent on the ground, which she was to retain. He then took her to his lawyer's office, where a contract for the sale of the property was drawn and executed. That contract provided for a sale of the property in fee for $1,000, of which $520 was represented by the mortgage then on it, and the balance was to be secured by a second mortgage from Stone for $450, bearing no interest and maturing in five years. About a year later, having received no rent, she showed her copy of the contract to a friend, who told her that she had conveyed the land as well as the house to Stone. She said that the information shocked her, because she had understood that she had conveyed only the house, and that she did not know when she signed the contract of sale and the deed that she was conveying the land as well as the house. In August, 1935, Stone borrowed money on the property to pay off the balance due on the mortgage for $520, and also the mortgage for $450 to Mrs. Gross. In the following May Mrs. Gross filed the bill in this case, in which she alleged in effect the facts stated above, and prayed that the deed conveying the property to Stone be set aside. The defendant answered, denied that the transaction was inequitable, and denied that it had been induced by fraud. The case was tried on the bill, answer, and the plaintiff's evidence. At the conclusion of the plaintiff's case, the court, after the case had been submitted on

"the testimony of the complainant and the pleadings" dismissed the bill "without prejudice." The appeal is from that decree.

The first point presented is appellee's contention that the appeal should be dismissed, on the ground that since the bill was dismissed "without prejudice" the decree was not final. The decree finally and completely terminated this proceeding in favor of the defendant. It effectually denied the relief prayed by the plaintiff upon the facts shown in the evidence given in her behalf, and determined that upon those facts she was entitled to no relief, and it required her to pay the costs. It also prevented her from having her right to relief upon those facts litigated in any future proceeding. It would indeed be difficult to formulate a decree more definitive in its nature than it is, and the motion to dismiss the appeal is therefore overruled. Code art. 5, sec. 30; 4 *C. J. S.*, *Appeal and Error*, sec. 121, and notes; *Miller's Equity Proc.*, sec. 305 *et seq.*; *Hendrickson v. Standard Oil Co.*, 126 Md. 577, 581, 95 A. 153.

The second and more important question is whether equity can relieve the appellant against the consequences of a unilateral mistake on her part as to the legal effect of an instrument conveying her property to another, when the mistake was due to her ignorance, was in part at least induced by her reliance upon, and confidence in, the grantee, whose relations with her were close, friendly, and in a sense confidential, when the transaction was unconscionable, where she was advanced in years and had little business experience and relied upon him for advice, and when he knew that when she executed the conveyance she did not understand its legal effect.

Appellee's contention is that appellant is bound by her deed, and that in the absence of "fraud or duress" she is estopped from denying that it conveyed to the appellee a good, merchantable, and unassailable title to the property described in it. Appellant, on the other hand, contends that if she executed it in ignorance of its legal effect, and that, contrary to her belief and intention, it

granted a greater interest in the property than she intended to grant, that if appellee, knowing that she relied upon his good faith, and knowing that when she executed it she did not understand that she was granting her entire interest in the property, nevertheless accepted it without explaining its effect to her, and that the bargain was unconscionable, that she is entitled to have it canceled, upon restoring to the appellee such moneys as he may have paid to her on account of the transaction. Accordingly, she asked (1) that the deed be annulled; (2) that pending the proceedings he be enjoined from disposing of the property.

Before considering the evidence affecting those contentions, some reference to what the transaction actually was should be made. Before she executed the deed Mrs. Gross owned a property for which she had paid $4,300, which was subject to a mortgage for $520. Under the contract of sale she agreed to convey that property by a good and merchantable title to Stone for $1,000. She later executed a deed carrying out that contract. She received no cash then, for of the purchase price of $1,000, $520 remained in the first mortgage which she had given to the Arrow Building Association, $450 was represented by a second mortgage from Stone to her, payable in five years without interest, and it does not appear with any certainty that he even paid her the balance of $30. Later he borrowed on the same property money to pay off the two mortgages, one to the Arrow Building Association for $520, and one to her for $450. From the proceeds of that loan he paid her on account of the balance due on the mortgage to her, which was then $395, $360.05, leaving still an unsecured balance due her of $34.95, which is still unpaid. Before she released it, he had paid her from time to time, on account of his mortgage debt of $450 to her, $55. So that the result of the transaction is that for perhaps $12 or $15 of his own money Stone acquired the appellant's property. For the $360.05 in cash, which she received, was obtained by Stone's mortgaging the very property she had conveyed to him.

The relations between Mrs. Gross and Stone, and the circumstances attending the transaction, are perhaps best described in these excerpts from her testimony: "Now, then, what happened in 1934 or 1935 that made you sell the house? A. Well, there were taxes due and I got a loan and I could not pay that, and it was the time of depression, there were no roomers, no boarders, and I could not make it and I got back. Q. Who was Mr. John T. Stone? Where did you meet him? A. He was boarding in the house. Q. How did he come to buy the house? A. Well, he knew I was worried and he said he would see what he could do, so he did see what he could do and he told me he could not get any loan from his relation. So he went up to where I got my loan on another house there and they would not give it to him. Then Mrs. Harris went up and pleaded, I don't know what she said, but anyway, they agreed then to give him a loan. * * * Q. Who gave him the loan? A. The building and loan. * * * He asked how much I wanted for the house and I said— Q. Was there a ground rent on the house when you bought the house that day? A. No, I bought the ground with the house. Q. How much ground rent was on it when you bought it first? A. $45. Q. Then you bought the ground with the house? A. Yes, sir. Q. Now then go ahead and tell his Honor in your own words what happened? A. Then he said 'How much do you want for the house?' I said, 'Well, I think I ought to have $1,500.' He said, 'With ground and all'? I said, 'No, positively, I am not selling the ground.' I said, 'As long as I have that bit of ground rent coming in, I would not feel so impoverished, if I needed a hat or pair of shoes I could look forward to that.' I said, 'Do like other people do, buy the house first and then buy the ground, if you want to buy the ground—.' Q. Who were you talking to then? A. I was talking to Mr. Stone. Carrie says, 'Yes' and I don't know whether he winked to her or what, but she shut up like a clam, like that. I thought both of them were true friends of mine just the same as I was to them. I was like a mother to them. Q. Who

is Carrie? A. That is Mrs. Harris sitting over there. Q. Who is she? A. I took her in and gave her a home. Her home was broken up and I give her a home and was like a mother to her, and that is what I got. Anyway, I said, I would rather sell the house cheaper. I said, 'I will take $1,000 for the house, rent it and sell the ground.' There was never a word said about the ground. When he took me up to that place, I did not know where he was taking me— Q. Where did he take you. A. He took me up town some place to a lawyer Cohen. * * * What did you do when you went to the lawyer's office? A. There was nothing more said about the ground until the contract was wrote and Mr. Cohen says, 'How about the ground?' I said, 'I am not selling the ground.' And if he would have been honest he would have said then, 'I ain't going to buy your house,' but he didn't say a word. Mr. Cohen said 'How much ground rent'? I said, 'Forty-five dollars.' When he gave me the contract to read, I seen there was nothing in it about the ground rent, but I thought because he did not buy the ground that was not mentioned, and I didn't understand that 'in fee.' I thought that was buying on time, him paying me in payments. That is where I got fooled. He said, one time to me out there, 'Well, Mom, you don't think I would cheat you.' I said, 'Well, I don't think you would.' But I didn't know at the time that he did, because it was nearly a year that I was looking for the ground rent, you know, he had not paid anything on what he owed me. It was five years to pay so much off interest. The Court: Who is 'he'? Q. Who do you mean by 'he'? A. Mr. Stone. * * * Q. When was the first time that you knew you had signed a deed for the whole thing? A. It was almost a year then. Q. Who told you you had signed that? A. There was a lady asked me to let her see the ground. 'Maybe they have got your ground.' 'No, I didn't sell the ground.' She said, 'Let me see the paper.' I let her see the contract, She said, 'Yes, they have your ground.' * * * Q. What price did you sell the house for to Mr. Stone, what price? A. $1,000. Q. Was

that or not subject to a ground rent? A. $1,000. Q. Was that or not subject to a ground rent? A. Ground rent, yes. Q. How much was the ground rent? A. $45. Q. And that was the contract that you understood you made with him? A. Yes, sir. Q. And that is the only contract you ever did make with him? A. That is all I ever did make with him. Q. And did you know when you signed that deed, that you were selling him the ground. A. No, positively, no."

On cross-examination she testified in part as follows: "And when you read English you understand what you are reading? A. No, I don't understand 'in fee.' * * * Q. Mrs. Gross, did you read that paper? Did you read that paper over in my office? A. Yes, I guess I did. Q. Do you remember my calling my secretary into the office, in your presence and in the presence of Mr. John T. Stone, and dictating this contract? A. I can't hear a word you are saying. (The Court: She is a little deaf.) Q. Mrs. Gross, do you remember on March 7th, when I called my secretary in? A. Yes. Q. To the office where you and Mr. Stone were sitting? A. Yes. Q. And dictated the contract to my secretary, in your presence and in the presence of Mr. Stone, do you remember that? A. Dictated? Q. Dictated this contract to my secretary in your presence and in the presence of Mr. John T. Stone; do you remember that? A. No, I do not. Q. I told my secretary the contents of this contract, do you remember that, when I called my girl in my office and gave you this contract, which you later signed? A. I don't remember you calling a girl in. Q. Do you know who typed this contract while you were sitting in my office with Mr. John T. Stone? A. I thought you did. * * * Q. Do you remember me telling you in my office, do you want to get yourself a lawyer to represent you? A. No. Q. You don't remember that at all? A. No, don't remember that at all. * * * Q. Just a minute, Mrs. Gross. Did you make any statement to me in my office about any ground rent at all? A. You asked me. You said, how about the ground rent? I said, I am not selling the ground.

You said, 'How much ground rent?' I said, '$45 a year.' That is all that was said about it. You never said another word, neither did I. Why didn't he turn around to me and say, 'Well, Mom, I am not buying the house, if I can't buy the rent'? Instead of that you tricked me out of it. * * * Q. And you expected me to create a ground rent for you? A. Well, you ought to have had in there if the ground rent was not to be sold. You ought to have said then that I was to get $45 a year ground rent. Q. And it had a $520 mortgage. Who was to pay that off before making a ground rent? A. What? Q. Who did you expect to pay the $520 mortgage off first before creating the ground rent? A. The one who bought the house. Q. You knew that he was earning only so much a week and he had to make those payments to you? A. I wasn't looking for it all at one time. He borrowed $25 off me and he owes some of that yet. He owes $8 of that yet. When I got that little bit of money he says, 'Now don't let anybody know you got this money and they can't borrow,' and before we got home he borrowed $5 off me, after owing me $20. * * * Q. Where was this, in my office at night? A. Yes, in your office. Q. Seven o'clock at night? A. That is the only time I can remember. Q. Can you tell me the time? A. It was after supper. He said to me, 'Well, Mom, come on, we will go and settle up the house.' Q. Seven o'clock at night? A. I couldn't swear about the time, but it was after supper. It was dark. * * * Q. You attended to your own business, did you not? A. Yes. Q. You always handled your own business? A. Yes, but my son was with him and I sold it to him and his wife was with me and they had a lawyer. I don't know anything about law, not a bit, or they couldn't have pulled the wool over my eyes, the way they did. * * * Q. You told your son about your troubles and you told him you are going to sell the house, is that correct? A. Yes. Q. And he said, 'Look in the paper and see if you can find some one to sell the house to'? A. He didn't think I was going to sell it that soon, I guess. * * * Q. Mr. Stone at first did not want to buy

the house, is that right? He was not interested at all, is that correct? A. No, he was just baiting me; I thought he was baiting me. Q. Well, he did not want to buy the house, did he? A. He said he did not want to buy the house unless he got the ground and I told him I was not selling the ground? Q. Oh, he did say he would not buy it unless he got the ground? A. I said I would give him the house for $1,000 instead of selling the ground. You know I would not take $500 off and then give him the ground besides, do you think I would do that? Q. I don't know. I wasn't there when your deal was made with Mr. Stone. You told him you would sell him the house for $1500 with the ground, is that it? A. No. I didn't mention the ground because I positively—and Carrie and he both know it—positively I was not selling the ground. Carrie heard me more than once. Q. You dropped it to $1,000. Did Mr. Stone ask you to sell him the house and did you ask him, plead with him to buy it? A. He said, 'I will see what I can do for you,' so he was pottering around trying to get money from his friends and couldn't get it. Q. Trying to help you out? A. Then I thought he was befriending me, and when I went to go in the building and loan, they wouldn't give it to him. Then Carrie went up and pleaded, I don't know what she said. There sits one of the building and loan men, perhaps he knows what she said, but I don't. Anyway they agreed to give her a loan for me. Now, I don't know whether I have to pay that off or not."

At the conclusion of the plaintiff's case counsel for the defendant suggested to the court that he did "not even think" that his "brother had made out a case." The court thereupon very properly said: "There is, of course, no such thing as a demurrer prayer in equity, and you have the option of either resting your case on his testimony or putting testimony on in your own behalf. I do not think I have any power to rule at this time. Is there any more evidence, Mr. Joseph?" The defendant nevertheless elected to submit on the pleadings and the plain-

tiff's evidence, so that such evidence as there is in the case is not disputed.

The rule is firmly established that a competent person will not be heard to impeach his own deed unless its execution was induced by fraud or duress, or mistake made under circumstances sufficient to charge the grantee with knowledge thereof, which good faith required him to disclose to the grantor. *Jones on Evidence,* sec. 434, and chapter 15.

It is also settled law that parol evidence is not admissible to vary the terms of a written instrument otherwise valid by showing that it did not represent the true intent of the parties, although such evidence may be admitted to show that, because the minds of the parties never met, there was no contract at all. *Furness-Withy & Co. v. Fahey,* 127 Md. 333, 336, 96 A. 619; *Council v. Sun Ins. Office,* 146 Md. 137, 149, 126 A. 229; 4 *R. C. L.* 508; *Dolvin v. American Harrow Co.,* 125 Ga. 699, 54 S. E. 706, 28 L. R. A., N. S. 785, note, and case; *Pomeroy, Eq. Jur.* sec. 845; 9 *C. J.* 1169; *A. L. I., Restatement, Restitution,* sec. 51, comment a, illustration 2, see also cases cited in note to section 51.

Ordinarily, where the mistake which induced the execution of the instrument is one of law, or if unilateral, whether of law or of fact, equity will not afford relief unless it resulted from fraud, or duress, or was "accompanied by other special facts giving rise to an independent equity on behalf of the mistaken person, such as inequitable conduct of the other party." *Pomeroy, Eq. Jur.* sec. 842; 4 *R. C. L.* 508; 28 *L. R. A., N. S.,* 845; *Dulany v. Rogers,* 50 Md. 524; 9 *Am. Jur., Cancellation of Instr.* secs. 33, 36; *Euler v. Schroeder,* 112 Md. 155, 76 A. 164; *Wood v. Patterson,* 4 Md. Ch. 335; Note, 59 *A. L. R.* 809. On the one hand, courts are reluctant to disturb the binding force of the highly important rule of property and contract which gives finality to a written instrument purporting to express the will and purpose of the parties, by permitting the parties to say that it means more or less than its terms import. On the other,

they are unwilling to permit that salutary and beneficent policy to be used as a shield to protect, in the enjoyment of their unjust benefits, those who have by fraud, covin, or overreaching obtained from the weak, the unwary, the helpless, or the ignorant an unconscionable and inequitable advantage.

Accordingly, the pull of these conflicting policies has resulted in certain qualifications of the parol evidence rule that are generally accepted. One is that, while parol evidence is not admissible to alter or vary a written instrument expressing an agreement, it may be admitted to show that, because of a mutual mistake of the parties, their minds never met as to its subject-matter, and that consequently there never was an agreement. Where that fact is clearly shown, it is generally but not uniformly held that the instrument may be canceled. 4 *R. C. L.*, *"Cancellation of Instruments,"* secs. 20, 21. And in some instances such a mistake has been held sufficient to permit the reformation of the instrument so as to express the real intent of the parties, *Pomeroy, Eq. Jur,* sec. 850. So, too, where the mistake is unilateral, whether of law or of fact, parol evidence is admissible to prove it where it clearly and definitely appears that it resulted from fraud, imposition, violation of confidence reposed by the mistaken person in the other, or from other unconscionable or inequitable conduct. *Ibid.* secs. 843, 845.

That principle is stated in 9 *Am. Jur.* 378 in these words: "Generally it may be said that equitable relief by way of rescission will be given from a unilateral mistake relating to a material feature of the contract of such grave consequence that enforcement of the contract would be unconscionable, if the party making the mistake was in the exercise of ordinary diligence, and relief can be given without serious prejudice to the other party, aside from the loss of his bargain. Some courts, however, are inclined to restrict relief from mistake by way of cancellation to cases where the mistake is mutual, and not to grant relief on the ground of unilateral mistake

unless there is some especial consideration therefor. Still other courts hold that equity will not rescind a contract for a mistake by one party only, unless there has been fraud or inequitable conduct on the part of the other, or unless the mistake was brought about by the conduct of such other party, who seeks to take advantage of it."

And in *Pomeroy, Eq. Jur.* 846, it is said: "Whatever be the effect of a mistake pure and simple, there is no doubt that equitable relief, affirmative or defensive, will be granted when the ignorance or misapprehension of a party concerning the legal effect of a transaction in which he engages, or concerning his own legal rights which are to be affected, is induced, procured, aided, or accompanied by inequitable conduct of the other parties. It is not necessary that such inequitable conduct should be intentionally misleading, much less that it should be actual fraud; it is enough that the misconception of the law was the result of, or even aided or accompanied by, incorrect or misleading statements or acts of the other party. When the mistake of law is pure and simple, the balance held by justice hangs even; but when the error is accompanied by an inequitable conduct of the other party, it inclines in favor of the one who is mistaken. The scope and limitations of this doctrine may be summed up in the proposition that a misapprehension of the law by one party, of which the others are aware at the time of entering into the transaction, but which they do not rectify, is a sufficient ground for equitable relief. A court of equity will not permit one party to take advantage of and enjoy the benefit of an ignorance or mistake of law by the other, which he knew of and did not correct."

The application of those principles to varying facts is illustrated by cases collected in 59 *A. L. R.* 809, 28 *L. R. A.*, N. S., 785, in the Reporter's note to section 51, *A. L. I., Restatement, Restitution,* and in the notes to 4 *R. C. L., "Cancellation of Instruments,"* secs. 20, 21; 9 *C. J.* 1166, 1169, and notes, and in a note to *Wood v. Patterson, supra.* See, also, *Cooke v. Hus-*

*bands,* 11 Md. 492, at page 511; *Elling v. Travers,* 162 Md. 597, 160 A. 789. *Euler v. Schroeder,* 112 Md. 155, 76 A. 164, turned entirely upon the failure of the complainant to allege in her bill facts sufficient to bring the case within the rule that parol evidence is admissible to prove, and that equity will relieve against, a mistake induced by fraud, abuse of confidence, or other inequitable conduct, through which one party has obtained an unconscionable advantage. But that rule was recognized and applied in *Elling v. Travers, supra.*

Returning to the facts, it appears that the appellant, an elderly woman, rather deaf, in straightened circumstances, a boarding house keeper, inexperienced in business, unfamiliar with legal phraseology, for the purpose of selling a house and lot which she owned, sought the advice of the appellee, a boarder with whom she was on terms of friendly intimacy, and upon whom she was accustomed to rely for counsel and aid. He proposed to buy the house, and after some negotiation she stated to him in unmistakable language the terms upon which she would sell it. He took her to his lawyer, and she again repeated to him and to the lawyer, in answer to specific questions, the precise terms of the sale. The lawyer prepared a contract of sale which in part read as follows: "the said party of the first part does hereby bargain and sell unto the said party of the second part, and the latter doth hereby purchase from the former the following described property, situate and lying in the City of Baltimore and State of Maryland, and known as 609 Newkirk Street, in fee simple. Said property is a six-room house with bath, containing hot-air heat, at and for the price of $1,000.00, of which $30.00 has been paid prior to the signing hereof." Although she had at that time informed both the scrivener and the appellee that she was not selling the ground, the contract by the insertion of the words "in fee," bound her to convey the land. In reading it her attention was drawn to the description of the house, which was needlessly elaborate, and she failed to grasp the significance of the words "in fee." Stone, who was her friend, must have known of her

mistake, for she had just told him that she was not selling the ground. Knowing that, he failed to call her attention to what she was doing, although she had no other friend present to whom she could turn for advice. As a result of the transaction Stone acquired property for which she had paid $4,300 for $1,000, of which $520 was in a mortgage then on the property, so that for her equity he paid $450, and that he paid, except for a few dollars, from the proceeds of a mortgage on what had been her property which he had bought. In other words, he paid her with her own property, and, through an actual investment of an inconsiderable sum of money, acquired the property she owned. Her testimony that she did not understand the meaning of the words "in fee," and that, had she known what they meant, she would have signed neither the contract nor the deed, is clear, definite, and uncontradicted. Moreover, notwithstanding her testimony, and those facts established thereby, he elected to stand mute, and offered neither contradiction nor explanation of the transaction or the circumstances attending it.

This court is unable to accept the view that those facts are not sufficient to justify equitable relief, but on the contrary is of the opinion that the parties should be restored to the same status in respect to the property which they had before the transaction, that the deed from Mrs. Gross to Stone should be canceled upon the payment to Stone of any monies he may have paid on account of the purchase, but without prejudice to any rights, equities, claims, or demands which the Arrow Permanent Building Association, which is not a party to this proceeding, may have in, to, or against the property.

The decree will therefore be reversed and the case remanded for further proceedings in accordance with the views expressed in this opinion.

> *Decree reversed and cause remanded for further proceedings in accordance with the view expressed in this opinion, with costs to the appellant.*