SCHUMAN, ᴇᴛ ᴀʟ. *v.* GORDON INVESTMENT CORPORATION

[No. 324, September Term, 1966.]

*Decided June 29, 1967.*

The cause was argued before HORNEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ., and reargued before HAMMOND, C. J. and HORNEY, MARBURY, OPPENHEIMER, BARNES, Mc-WILLIAMS and FINAN, JJ.

*Melvin J. Sykes* for appellants.

*Edward Azrael,* with whom were *Azrael & Gann* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court. FINAN, J. dissents.

This action brought by a tenant against a landlord and the counteraction brought by the landlord against the tenant presents a question as to which party is entitled to use an exterior wall of the leased premises to advertise their respective business enterprises.

The tenant is a partnership consisting of David and Leonard Schuman trading as D & L Manufacturing Company (the Schumans or tenants), who are assemblers and distributors of dinette furniture. The landlord is Gordon Investment Corporation (Gordon or landlord), a real estate corporation which owns and leases property to Gordon's of Orleans Street, a related corporation which conducts a restaurant and a seafood carry-out business.

Gordon was and still is the owner of a complex of restaurants, shops, warehouses and parking lots in the area in Baltimore City bounded by Patterson Park Avenue on the west,

Orleans Street on the north, Montford Avenue on the east and Fayette Street on the south. The properties known as 2323-2331 Orleans Street, consisting of a number of interconnecting buildings of varying sizes and heights composing one building, were the last acquired by the owner before the lease was made. A portion of the building fronting on Orleans Street was later razed to make space for a parking lot.

After the landlord agreed to purchase the Orleans Street properties but before settling for them, Gordon and the Schumans entered into a lease of a portion of the Orleans Street and Montford Avenue properties. At the time the lease was executed no part of the Orleans Street property had been demolished and the brick wall (which is the subject of this controversy) had not been reconstructed as the northern "exterior" wall of the leased premises. The lease was prepared by a real estate broker who was not a lawyer.

The lease, which was executed on January 30, 1965, provided in relevant part that the landlord would—

> "demise and lease unto [the tenants] the premises known as 200-202 North Montford Avenue, also known as rear 2323-2331 Orleans Street, * * * consisting of entire premises, approximately 70 x 150, on two floors totaling approximately 21,000 square feet for a period of five (5) years beginning on the 1st day of March, 1965, and ending on the 28th day of February, 1970, * * *."

The landlord further agreed to allow the tenants—

> "to erect suitable and neat signs on both the Orleans Street entrance and also the Montford Avenue entrance. This shall be in addition to suitable and neat signs placed on the building itself; * * *."

The lease required the landlord to demolish the buildings on the property known as 204-206 Montford Avenue and convert it into a parking lot for the use of the tenants, but it is silent as to the demolition of that portion of the property fronting on Orleans Street which was to be converted into a parking lot for restaurant customers. Nor did the lease mention what would

constitute the north wall of the remaining portion of the Orleans Street property after the demolition of the other portion had been accomplished.

After the adjacent buildings had been razed, the leased building was completely separated from any other buildings. It had a loading dock on Montford Avenue and faced Orleans Street across the restaurant parking lot. There were alleys on the other two sides. And other than a door facing Orleans Street which the landlord had voluntarily cut through it, the wall was solid masonry.

Shorty after the tenants took possession, the landlord indicated that he wanted to paint an advertising sign on the outside of the wall facing Orleans Street, but when the tenants objected, he desisted temporarily. About a month later, however, Gordon wrote a letter to the Schumans advising them that a painter had been instructed to paint the wall; that prior to the inception of the lease he understood and still maintained that he did not lease the exterior wall or give them permission to use it; that he leased only the premises consisting of 21,000 square feet of floor space; that he never intended to rent the wall; and that the lease does not so provide.

When the sign painter started to work, the tenants attempted to have the police stop him but they refused to interfere. The tenants, posing as agents for the owner, then obtained a permit from the city to erect a sign and placed a temporary one over the doorway in the wall. But when the landlord denied authorization, the permit was revoked. Thereafter the Schumans brought suit against Gordon alleging that his sign violated the rights of the tenants and praying injunctive relief and damages. In his answer, Gordon claimed that the parties had reached an understanding during the negotiations for the lease to the effect that the wall was to be used by him to advertise his restaurant. Gordon also filed a cross-bill alleging that while the lease permitted the tenants to place "suitable and neat" signs at the entrances and on the building itself, he had not intended to give the Schumans a "right to use the wall" in question and that they wrongfully interfered with the painting of the Gordon sign and placed their "own unsuitable and ugly sign" on the wall. Among other things, Gordon sought an injunction to re-

strain the Schumans from interfering with the Gordon sign and from using the wall for their own advertising.

When the case was heard by the chancellor (Harris, J.), one of the tenants (Leonard Schuman) testified that the parties had agreed that certain buildings were to be torn down and that they were to occupy the remainder of the buildings in their entirety but denied that they had agreed to a reservation of the wall for the advertising purposes of the landlord. Instead, he claimed that the parties discussed only the necessity of the tenants having a suitable sign thereon to enable customers to recognize their place of business.

On behalf of the landlord, the broker (David Kornblatt) testified that the tenants were not negotiating for the entire premises but for space within the existing building; that when he prepared the lease he had intended to say that "the entire premises consisting of approximately 21,000 square feet" rather than say that the entire premises were to be leased. He further testified that he had told the tenants before the lease was signed that the landlord intended to use a space of thirty feet inside the building as well as the outside wall for his own advertising sign.

The landlord (David Gordon) also testified that it was his intention to reserve from twenty-five to thirty feet in the building for storage purposes and that he specifically told the Schumans that he wanted to keep the wall for his own use. He also said that he agreed to give the tenants permission to erect a neat and suitable sign for identification purposes but emphasized that he was reserving the use of the large wall.

On redirect, the tenant denied having agreed that the landlord could use the wall for a sign and stated that had he known that this was his intention he would not have signed the lease.

After the case was closed, the chancellor having inspected the premises, informed the parties by way of a letter addressed to counsel that it seemed to him that the contentions and interests of both parties would be fairly and reasonably met by allowing the tenants to erect (1) a "suitable and neat" sign (no higher than forty-six inches and no longer than twenty feet) over the door in the wall; (2) a smaller sign on either side of the entrance under the larger sign above it; and (3) a sign

on a pole at the entrance to the parking lot on Orleans Street. Thereafter when further discussions as to a settlement were ineffective, the chancellor filed an opinion and decree. The opinion was to the effect that while the landlord had reserved the right to use the exterior wall, the lease allowed the tenants to erect the signs described in the letter. The decree dismissed the bill of complaint, enjoined the tenants, on the cross-bill, from interfering with the painting of the wall by the landlord, and permitted the tenants to erect the specified signs.

While the tenants presented five and the landlord posed three questions on appeal, only two require serious consideration. They are (i) whether the chancellor erred in admitting and considering parol evidence as to the claimed inconsistencies or ambiguities in the lease; and (ii) if the admission of extrinsic evidence was proper, whether the finding of the chancellor that both parties had a right to use the wall was clearly erroneous.

(i)

We think the chancellor was right in deciding the case as he did. Since the lease is indefinite in some respects and contains several uncertainties or ambiguities, extrinsic evidence was admissible to explain its terms. In the first place, the provision allowing the tenants to erect suitable and neat signs at both entrances (the merchandise entrance by way of the loading dock on Montford Avenue and the pedestrian entrance from Orleans Street by way of the restaurant parking lot) and "on the building itself," in addition to at least giving rise to a presumption that the landlord had reserved the remainder of the outside walls for its own use, is uncertain in that it does not specify what type or size of sign could be erected by the tenants or where on the building itself were signs (other than the entrance signs) to be placed. Similarly, the lease is ambiguous in that it is not certain where the "entire premises, approximately 70 x 150, on two floors totaling approximately 21,000 square feet," was located. At the time the lease was executed, the several properties referred to in the lease could have included not only 200-202 Montford Avenue and all of 2323-2331 Orleans Street but also 204-206 Montford Avenue and all of the buildings then standing thereon whereas at the time the

leased premises (wherever located) were occupied by the tenants all of the buildings except those remaining on 200-206 Montford Avenue and the remaining portion of those in the "rear" of 2323-2331 Orleans Street had been demolished. Furthermore, the lease does not indicate what portion of the Orleans Street property was to be razed to make space for the parking lot (which was not even mentioned) or what portion thereof would constitute a part of the leased premises. Although construable against the landlord who had it prepared, *Kelley Construction Co. v. Wash. Sub. San. Comm.,* 247 Md. 241, 230 A. 2d 672 (1967), and *Trotter v. Lewis,* 185 Md. 528, 45 A. 2d 329 (1946), other ambiguities throughout the lease are reflected in the attempts the draftsman made to distinguish between the *property* of the landlord and the *premises* of the tenants.

The claim of the tenants, on the basis of what was said in *Needle v. Scheinberg,* 187 Md. 169, 49 A. 2d 334 (1946), that they have the exclusive right to the use of the outside wall enclosing the portion of the building covered by the lease for their own advertising, overlooks the fact that the meaning of the lease, without the aid of extrinsic evidence to explain it, does not certainly reveal the intention of the parties. On the other hand, the rule in such circumstances is well settled. In *Chesapeake Brewing Co. v. Goldberg,* 107 Md. 485, 69 Atl. 37 (1908), involving the interpretation of an ambiguous lease, it was said (at p. 488) :

> "It is of course familiar law that extrinsic evidence is not legally admissible to alter, contradict or vary the terms of a written contract, yet it is equally well settled that when a question arises as to the general intention of the parties, concerning which the instrument is not decisive, proof of independent facts collateral to the instrument, may be admitted."

Likewise, in *Sommers v. Dukes,* 208 Md. 386, 118 A. 2d 660 (1955), the Court, though recognizing the general rule that parol evidence is inadmissible to vary or contradict the terms of a written agreement, went on to say (at p. 394) that "if any doubt arises from the language of a contract as to the

intention of the parties, extraneous evidence may be admitted to aid the court in comprehending its meaning." Also see *Dinsmore v. Maag-Wahmann Co.,* 122 Md. 177, 89 Atl. 399 (1914); *United Railway Co. v. Wehr,* 103 Md. 323, 63 Atl. 475 (1906); *Stockham v. Stockham,* 32 Md. 197 (1870). *Cf. American Weekly v. Patterson,* 179 Md. 109, 16 A. 2d 912 (1940); *Gross v. Stone,* 173 Md. 653, 197 Atl. 137 (1938); *Roberts v. Bonaparte,* 73 Md. 191, 20 Atl. 918 (1890).

Considering the evidence to the effect that the landlord intended to reserve the exterior wall for his own use, the doubt as to the location of the floor space the tenants were to occupy and the uncertainty of the type and size of the signs and the places they were to be erected, it is clear that the admission of extrinsic evidence to enable the court to determine the real intention of the parties was proper.

### (ii)

Nor can we say that the findings of the chancellor, who saw and heard the witnesses and had an opportunity to judge their credibility, were clearly erroneous. Maryland Rule 886 a. After hearing the testimony of the tenants, the draftsman of the lease and the landlord, and inspecting the premises, the chancellor concluded that the landlord had reserved the right to use most of the wall for advertising purposes and that the tenants had a right to erect a locative sign (46 inches high and 20 feet long) on the wall of the building over the entrance door in addition to a smaller sign on one side of the entrance and another smaller sign on a pole at the entrance to the parking lot. We think that what the chancellor did was fair and reasonable under the circumstances, particularly that which was decreed with regard to the type, size and location of the tenants' signs.

In view of our holding as to the admissibility of parol evidence and the effect thereof, we do not reach the question of what, if any, legal presumptions would apply in the absence of the evidence referred to.

*Decree affirmed; appellants to pay the costs.*