152

K. W. KELDSEN, ADMINISTRATOR OF THE ESTATE OF HOWARD MOST, JR., DECEASED,

*Appellant,*

(Defendant below)

vs.

WM. N. BRIMMER, ADMINISTRATOR OF THE ESTATE OF CLAUDE C. CAMPBELL, DECEASED

*Appellee,*

(Plaintiff below)

(No. 2825; November 18th, 1958; 331 Pac. (2d) 825)

154

For the appellant, the cause was submitted upon the brief of Murane & Bostwick of Casper, Wyoming, and oral argument by Mr. Edward E. Murane.

For the appellee, the cause was submitted upon the brief of Sindell, Sindell, Bourne & Disbro of Cleveland, Ohio, Mr. William N. Brimmer of Rawlins, Wyoming, and Mr. J. P. Tonkoff of Yakima, Washington and oral argument by Mr. Brimmer and Mr. Richard M. Markus of Sindell, Sindell, Bourne & Disbro.

Heard before Blume, C. J. and Harnsberger and Parker, JJ.

## OPINION

Mr. Justice HARNSBERGER delivered the opinion of the court.

A Luscombe 85 Horsepower Airplane on a flight from Jackson, Wyoming, to Laramie, Wyoming, crashed about the hour of 10:07 a.m. in a mountainous area of Wyoming at an elevation of approximately 9,200 feet above sea level. The accident resulted in the death of both the airplane's owner-pilot, whose estate is the defendant in this action, and the lone passenger, whose estate is the plaintiff.

In bringing this action for the wrongful death of its deceased, the plaintiff below claimed the following six specific acts were pilot negligence:

(1) He operated the aircraft over elevations in excess of 9,000 feet of very rough terrain at a time when the outside temperature was in excess of 80 degrees.

(2) He loaded the aircraft so that he was operating it at a weight of 250 pounds in excess of its 1,400 pound limitation.

(3) He operated the aircraft less than 500 feet above the surface in violation of Civil Air Regulations, Section 60.17.

(4) He operated the aircraft off the established airways where there were established radio signals and communications and emergency airports with elevations not exceeding 7,500 feet.

(5) He violated Section 60.11 of the Civil Air Regulations by failing to familiarize himself with the current weather reports and terrain before making the flight.

(6) He failed and neglected to keep the aircraft under control and observe the high, rugged terrain and weather conditions under which he was operating the aircraft.

These charges, with minor exceptions, were generally denied, and the defendant below also interposed as affirmative defenses:

(1) At the time of the accident the plane was being flown by plaintiff's deceased and the accident was due solely to his negligence.

(2) If there was negligence on the part of the defendant's deceased, there was also contributory negligence on the part of plaintiff's deceased.

(3) The accident was caused by a down draft or air pocket which threw the plane out of control and crashed it to the ground, and such cause was beyond the control of the operator of the plane and was an Act of God.

The case was tried to a jury that returned a verdict in favor of the plaintiff and against the defendant in the sum of $37,592.98 and costs. In conformity with that verdict the court entered its judgment and it is from that judgment defendant appeals to this court.

The record and briefs disclose that both parties abandoned certain of their contentions. The plaintiff withdrew its charges of violations of Civil Aeronautics Administration regulations and relied solely upon issues of common law negligence. The defendant abandoned the affirmative defenses that it was plaintiff's deceased who piloted the airplane and that there was contributory negligence on the part of plaintiff's deceased. However, the additional question of fuel sufficiency was injected by evidence received. In consequence, the liability of defendant was submitted to the jury on three issues; namely, was the proximate cause of death due to the pilot's negligence in (1) overloading the airplane, (2) having an insufficient fuel supply, (3) flying an improper airway?

Appellant alleges a multitude of errors, but stripped to their bare essentials they only charge (1) the verdict of the jury was without substantial evidence to support it; (2) the court erred in giving or refusing certain instructions; and (3) the court erred in sustaining or overruling certain objections to testimony and evidence.

We shall first inquire: (a) Did plaintiff adduce any substantial evidence that the aircraft was operated overweight at the time of the accident? (b) If there was such overweight, was it the proximate cause of the accident?

The record brought to us by this appeal is very unsatisfactory. By a tedious and time-consuming examination, we discover that many instruments which appear to be marked by the court reporter as exhibits and concerning which testimony was given were never offered in evidence; others although offered in evidence were never received in evidence; and still others

offered in evidence were expressly rejected by the court. We also find that what was repeatedly referred to as Exhibit 3, and concerning which a major volume of the testimony of several witnesses was identified, is absent from the record. There are three unmarked airways maps accompanying the record which might be assumed to be intended as the missing exhibit, but we cannot make that assumption. In consequence, the bulk of the testimony of a number of witnesses becomes completely valueless, inasmuch as such testimony is meaningless without being correlated with the instrument with respect to which that evidence was given.

It is indeed unfortunate that the case of the plaintiff-appellee is thus so adversely affected, but that does not relieve us from deciding whether the record as it stands before us contains that substantial evidence favorable to the plaintiff which is necessary if the judgment is to be affirmed. On the other hand, considering the obvious shortcomings of the record, only a part of which we have mentioned, we are left in doubt as to what occurred at the trial and what evidence actually went to the jury. As counsel already know, additional grave errors in the transcript of testimony were present, and although we were successful in overcoming a part of that fault through stipulation of counsel, it is too great a task to attempt a similar clarification of the entire record and should not be undertaken.

We nevertheless will proceed to discuss this case on the basis of the testimony and evidence in the record which remains after deletion of that which seems meaningless.

The undisputed evidence which remains shows that the airplane flew out of Jackson, Wyoming, in the

early morning and traveled in a general southeasterly direction to the vicinity of Rock Springs where its course was changed to fly almost due east to a point in the neighborhood of Rawlins, Wyoming, and thence on toward Laramie in a more or less straight line in a slightly southeasterly direction when it crashed at a point 25 to 50 miles east of Rawlins.

Before take off the two men were seen examining an airways map and were heard to say they would wait until arrival at Rawlins to decide whether they would refuel at that point. The airplane was equipped with a 15 gallon plastic gas tank in each wing, but due to a recertification by the U. S. Department of Commerce, Civil Aeronautics Administration, made necessary by changing of the original wood propeller to a metal propeller, the permissible gasoline load was reduced from 30 gallons to 20.3 gallons. Under ordinary flying conditions the gas consumption was approximately 5 gallons per 100 miles; the airplane's cruising speed was approximately 100 miles an hour; the gasoline weight per gallon was 6.1 or 6.2 pounds; the distance from Jackson, Wyoming, to the crash point on the course taken was approximately 315 miles; and the estimated weight of gasoline consumed up to the time of accident was approximately between 91 and 96 pounds.

The airplane was in excellent condition with a flying ceiling of around 16,500 feet, and was equipped with both low and high frequency radios. The ground temperature at 9:28 a.m. at Rawlins was about 80 degrees and it was somewhere between 76 and 80 degrees at Laramie. It was estimated that when the crash occurred, the temperature near the scene of the accident at an elevation of 9,200 feet was about 69 to 70 degrees. The weather was generally good, except per-

haps for some thunderheads and turbulence in the general area and a slight sprinkle that fell sometime after the crash.

Between Rawlins and Laramie there was a direct airway for flying aircraft. This was shown as a regular airway on a radio facility map in evidence as a plaintiff's exhibit, and that airway was serviced by Omni high frequency radio beam broadcast from the Cherokee Radio Station located a short distance from Rawlins and by another Omni high frequency radio beam broadcast from a station located a similar short distance from Laramie. Omni radio signals are non-directional; are transmitted in all directions from a station, and as appellee pointed out in brief, "A pilot with an Omni radio could set his receiver for the frequency of the broadcasting station and fly with his radio navigation device in the direction of increased signal intensity which would lead him directly to the broadcasting station", and further plaintiff's brief said that Omni was an "aid to navigation". Another airway between Rawlins and Laramie went in a slightly northeasterly direction from Rawlins to Medicine Bow where the route turned sharply toward the south and thence on to Laramie, making the airway a sort of dog-leg. This airway was serviced by a low frequency radio beam between Rawlins and Medicine Bow and another such radio beam between Medicine Bow and Laramie. These low frequency beams are directed from their transmitting stations along a specific path; in other words, they are singly directional and a pilot can follow them by responding to their code signals.

In considering the weight question, plaintiff's pleading narrows that limitation to the weight allowable for "take off" and "landing". Furthermore, the jury was not free to disregard the 1953 certificate which

appears to be the latest certification of the airplane granted by the U. S. Department of Commerce, Civil Aeronautics Administration. This certificate gave the empty weight of the airplane as 876 pounds and the useful load as 624 pounds, an allowable total of 1,500 pounds, so if the aircraft was loaded within that maximum of 1,500 pounds, it cannot be said there was an overweight which established the pilot's negligence. Some testimony seemed to more or less agree that the weight limit of the airplane was 1,400 pounds, rather than the 1953 certified gross weight of 1,500 pounds. This difference, however, does not present the ordinary case of conflict in evidence so as to entitle the jury to disregard the one and accept the other at its choosing. The situation more nearly approaches the best evidence rule rather than one of weight of evidence which it is the jury's province to determine. The best evidence would seem to be the certified weight of the aircraft as established by the authority to whom the government, which controls air flight use, has given that decision.

Let us consider the position regarding weight taken by the appellee. This is that the evidence showed the *original* empty weight of the airplane was 855 pounds and its useful weight 545 pounds, making a gross or total allowable weight of 1,400 pounds. To the empty weight of 855 pounds, the appellee says, should be added 5 to 7 pounds for wheel skirts; for low frequency and high frequency radio, 22 to 25 pounds; for metal propeller, 21 pounds; for oil, 8.4 pounds; and for gasoline, 123.83 to 125.86 pounds; or a total for all those items of between 179.87 pounds to 187.26 pounds. These totals are therefore separately subtracted from the useful weight figure of 545 pounds and respectively show the remaining figures of 365.13 or 357.75 pounds to be the balance allowable for pas-

sengers and baggage. Appellee then takes the estimated weights of the two men at 380 pounds, adds as weight of baggage 100 pounds and tie downs, 25 pounds, to reach a total of 505 pounds as the weight at take off. From this 505 pounds, appellee subtracts 358 pounds as a round number figure for allowable passengers and baggage weight, leaving what is claimed to have been an overweight of 147 pounds at the time of the airplane's take off at Jackson. In order to compute the loaded weight of the aircraft at the point of accident, appellee then deducts 96 pounds as the estimated weight of gasoline consumed, and arrives at an overweight figure of around 50 pounds at the time of the crash. Appellee also listed certain other items but as appellee assigns them no weight they may not be considered.

For this discussion, we are taking the weights used in appellee's computations, as we remain unconvinced from the record as to just what evidence concerning weights is most favorable to the appellee. However, while there may be some evidence to justify the weights claimed by plaintiff-appellee, that evidence is inconclusive, insubstantial, and insufficient to support a finding that the accident was *proximately caused* by the pilot negligence in overloading the airplane. In the first place, there is no evidence at all that any amount of overloading of the airplane caused the crash. On the other hand, the record discloses the physical fact that the airplane had actually been successfully flown when it was heaviest loaded at Jackson, over high, rugged mountainous terrain, but that it crashed when its load was decreased by over ninety pounds. Although plaintiff's petition alleged that the weight limit of the airplane for take off and landing was 1,400 pounds, it was not alleged that a loading in excess of 1,400 pounds was dangerous, unauthorized or

prohibited weight for flying. When it alleged the pilot negligently operated the airplane at a weight of 250 pounds in excess of 1,400 pounds, the plaintiff was burdened with proving that there was a 1,400 pound limitation for flying the airplane, and that a loading in excess of that weight was a proximate cause of the accident. It was not enough merely to prove the craft was loaded beyond a weight to which it was limited when taking off or landing. Of course, to fly at a weight above 1,400 pounds would seemingly require that the plane be so overloaded at take off, but even so such an overloading at take off or landing was not shown to have caused the death of the deceased, for that weight at take off must be shown to have proximately contributed to the disaster. Similarly, an overweight of about 50 pounds at the time of the crash must be proved to have been a proximate cause of the accident. There was no such proof. The only evidence which even approached that mark was testimony that weight somewhat lessened the ability of an airplane to attain its maximum ceiling of 16,500 feet. The evidence that with the consumption of about 100 pounds of gasoline the balance of the airplane was affected does not bear upon the question of overweight and was unimportant, especially as other testimony explained that there were devices on the aircraft to make necessary balance corrections to compensate for that condition.

So, even if we agree with appellee that there was some evidence to show that at the time the airplane crashed it was weighted to 50 pounds more than the weight limited for its take off and landing, still the plaintiff has completely failed to fulfill its burden of giving to the jury some substantial evidence from which they might justly have found that the pilot's negligence in overweighting the airplane was a proxi-

mate cause of the death of plaintiff's deceased. It should be needless to further point out that if the evidence only justified the jury in concluding the weight limit was 1,500 instead of 1,400 pounds, the airplane was not overloaded at all, but was being flown within allowable weight limits both at take off and at the time of the crash, even according to plaintiff-appellee's own computations.

Both sides had considerable to say at their oral presentation on the subject of fuel, although appellant's brief is silent on the question and appellee's brief touches it but lightly by (1) calling our attention to what testimony described as the incoherent, "legible" or "intelligible" words "out of gas" uttered by plaintiff's deceased while he was delirious; (2) agreeing that both deceased had repeated several times that the plane had hit a down draft and had gone out of control; (3) pointing out that there was some negative testimony that certain persons who came to the scene of the crash neither saw nor smelled any gasoline; (4) mentioning expert testimony that the airplane's position and propeller damage indicated it was not flying under full power at the time of the crash. No explanation is offered as to why a flight at less than full power indicates a lack of fuel. On the other hand, a power flight of any degree would seem to indicate the airplane did have fuel at the time. Additionally, a plaintiff's expert witness explained that because of the airplane's position on the ground, the gasoline would have drained out, and another witness who was there at an earlier time saw gasoline dripping. No conflict in evidence occurred where the testimony of some witnesses merely showed they did not see or smell gasoline, while other evidence indicated there was such fuel. In consequence, if the jury's verdict was based upon its finding there was an insufficient

fuel supply, that finding was without the support of any substantial evidence.

The final issue concerns the route taken. There can be no question under the appellee's own evidence but that the flight was over an established airway. As has been pointed out, the route taken is shown to have been by an established airway, not only by testimony of plaintiff's witnesses, but also by plaintiff's own map exhibit which shows it to be one of two airways between Rawlins and Laramie. The plaintiff's evidence does show this direct airway was not serviced by a low frequency directional radio beam, but it also shows it was serviced by Omni radio beams out of Rawlins and Laramie. The evidence also shows the terrain below the airway was a rugged, mountainous area over which there was frequently some turbulence and on the day of the accident there was a wind velocity of between 20 and 30 miles per hour. At the same time, however, the appellee points out that at the time of the accident, "there was no unusual or extraordinary weather conditions for that area and time", "that it was a beautiful warm day" and the "weather had been fair and warm. There was no rain or storm of any kind whatever prior to the crash." Appellee stresses that at 80 degrees, which the evidence showed was the approximate temperature in both Rawlins and Laramie, the effective ceiling for the Luscombe would have been between 12,000 and 13,000 feet instead of its normal ceiling of 16,500 feet. But, of course, this takes no account of evidence that the ground temperature at the 9,200-foot elevation of the crash was estimated by the experts to be approximately 69 to 70 degrees where the 16,500-foot-normal-service ceiling of the airplane would not have been nearly so greatly re-

duced as it would have been at a temperature of 80 degrees, if its effective ceiling would have been affected at all.

Certain of plaintiff's witnesses testified that the direct route was more dangerous than the airway by way of Medicine Bow, but at the same time these witnesses said they flew the direct route themselves. One such witness even said he would not fly that route, but immediately confessed he had flown it more than once. There was also testimony that the direct route should be flown at altitudes ranging from 12,000 to 14,000 feet or better and that the route was for high performance aircraft. Appellee also points out that there were no emergency landing fields along the direct route. Upon these and similar facts appearing in the evidence, the plaintiff relied to prove there was pilot negligence in electing to take the direct route from Rawlins to Laramie rather than to fly to Medicine Bow and then to Laramie.

We must decide then if such evidence warrants the conclusion that the pilot was negligent in making that choice.

Appellee's position seems to be that not only was flying the direct route a negligent act of the pilot but, because an accident occurred during the flight, the taking of that route must be deemed a proximate cause of the accident. With this we cannot agree.

In the first place, it was neither alleged nor proved by any evidence or by the testimony of any witness that to fly the direct route was contrary to any flight rule or even contrary to any accepted practice. Certainly plaintiff's own evidence disproved its allegation that the pilot "operated said aircraft off the estab-

lished airways where there were established radio signals and communications * * *", and the balance of that allegation to the effect that the airway was without "emergency airports and elevation not exceeding 7,500 feet", was not shown to have played any part in the accident. Plaintiff's allegation that the pilot operated the aircraft over very rough terrain, which had an elevation in excess of 9,000 feet, was undoubtedly proved—in fact, it was not even disputed. However, plaintiff's further allegation that the flight at an elevation in excess of 9,000 feet was made when the outside temperature was in excess of 80 degrees obviously implied that the alleged temperature of 80 degrees adversely affected the airplane's flying ability. Conceding that this is correct, at least to the point of lessening the aircraft's ability to attain its maximum ceiling, still, as has already been pointed out, plaintiff's own witnesses gave the estimated temperature as being 69 to 70 degrees in the accident area at the approximate elevation mentioned, instead of the 80 degrees pleaded. This evidence served to disprove plaintiff's theory that because of high temperature, the airplane's ability to attain its normal ceiling was adversely affected.

To sum up, there was no proof whatsoever that it was the pilot's duty to avoid the airway which he was flying at the time of the accident or that he acted in any way contrary to accepted practice by flying the direct route. Indeed it was proved by plaintiff's witnesses that the pilot only did what plaintiff's own experts said they had done themselves. Although some such witnesses explained they flew above 12,000 feet when flying that airway, there was no evidence that the pilot in this case was not flying well above even the 14,000-foot level certain witnesses testified was the better practice. There was no evidence that it was

the pilot's duty to fly only those airways for which there were emergency airfields of any particular elevation or which were within any prescribed distance from the course of flight. There was no evidence that the airplane in question was restricted to airway flights serviced by low frequency directional radio beams or that it was prohibited from or that it was bad practice to fly an airway serviced only by non-directional Omni radio beams, nor was there evidence that it was improper for the airplane in question to be flown above the 14,000-foot elevation which testimony showed was acceptable for flights being serviced by such Omni radio beams.

Under these circumstances, we have no choice but to hold the plaintiff failed in meeting its burden to prove that the taking of the direct route was a negligent act and, of course, it follows there was no such negligence to be attributed as a proximate cause of the accident. Without the necessary evidence to support this last finding, as was also the case with respect to the weight and fuel questions, the verdict of the jury was left without any substantial evidence to justify it and the judgment upon that verdict must be reversed.

Appellant's further complaint that there were errors in the court's rulings respecting hypothetical questions needs not be discussed further than to say the expressions on the subject heretofore made by this court in Johnson v. Hanover Fire Ins. Co., 59 Wyo. 120, 135, 136, 137 P.2d 615, 619, still remain our views.

Finally, appellant says there was error in the court's refusal to instruct the jury respecting an Act of God. The statements in evidence which were quoted in appellee's brief as being made by both deceased, "that

the plane had hit a down draft and had gone out of control" was evidence that an elemental force was involved in the crash. This warranted an instruction regarding an Act of God and probably it should have been given, as this was the theory of the defendant, and the jury was entitled to be instructed upon it just as it had been instructed with respect to plaintiff's theory.

While the verdict must be set aside because it is not supported by substantial evidence, and the judgment of the court must therefore be reversed, we feel this should not be a final disposition of the case. As previously explained, this court is not at all satisfied that it has been given an accurate recount of all that occurred during the trial because, for reasons heretofore stated, we are compelled to delete from consideration certain testimonies which have been rendered meaningless by omission from the record of the exhibits vital to their understanding. Therefore, while the correctness of the verdict and judgment must be measured in this appeal by that which the record itself discloses, we believe the way to obviate what may otherwise be a miscarriage of justice is to remand the cause for a new trial. It is so ordered.

Reversed and remanded for a new trial.